1  MARTIN L. WELSH, ESQ.
   Nevada State Bar No. 8720
2  **LAW OFFICE OF HAYES & WELSH**
   199 North Arroyo Grande Blvd., Suite 200
3  Henderson, Nevada 89074
   Phone: 702-434-3444
4  Fax: 702-434-3739
   Email: mwelsh@lvlaw.com
5

6  LEVI & KORSINSKY LLP
   Donald J. Enright, Esq.
7  (Counsel will Comply with LR IA 11-2 Within 45 Days)
8  1101 30th Street, NW, Suite 115
   Washington, DC 20007
9  Telephone: (202) 524-4292
   Facsimile: (202) 333-2121
10 Email: denright@zlk.com

11 [*Additional Counsel Listed on Signature Page*]

12 Attorneys for Plaintiff

13              IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF NEVADA
14

15 SIPDA REVOCABLE TRUST, by Trenton J.          CASE NO.: 2:19-cv-00428
   Warner, Director, on behalf of itself and all
16 others similarly situated,

17              Plaintiff,                        **CLASS ACTION COMPLAINT**

18 v.                                             **JURY TRIAL DEMANDED**

19                                                (Counsel will Comply with
20 THE PARKING REIT, INC., MICHAEL V.            LR IA 11-2 Within 45 Days)
   SHUSTEK, ROBERT J. AALBERTS,
21 DAVID CHAVEZ, JOHN E. DAWSON,
   SHAWN NELSON, NICHOLAS NILSEN
22 and ALLEN WOLFF,

23              Defendants.

24

25       Plaintiff SIPDA Revocable Trust by Trenton J. Warner, Director (hereinafter "Plaintiff"),

26 as and for its Class Action Complaint against Defendants The Parking REIT, Inc., Michael V.

27

28

Shustek, Robert J. Aalberts, David Chavez, John E. Dawson, Shawn Nelson, Nicholas Nilsen and Allen Wolff, alleges upon information and belief[1], as follows:

**PRELIMINARY STATEMENT**

1.     This is a class action against The Parking REIT, Inc. ("Parking REIT" or "the Company") and certain of its current and former officers and directors on behalf of all public shareholders of the Company and MVP Monthly Income Realty Trust, Inc. ("MVP REIT I") between August 11, 2017 and December 15, 2017 ("Class").

2.     This action seeks damages and injunctive relief in connection with Defendants' use of false and misleading proxy statements to obtain shareholder approval for the merger (the "MVP Merger") of Parking REIT (then known as MVP REIT II, Inc.) and MVP REIT I, and related charter amendments.  The MVP Merger was announced in May 2017 and consummated on December 15, 2017.

3.     The MVP Merger was effectuated via separate false and misleading proxy statements disseminated to shareholders of MVP REITs I and II, respectively, on or about August 21, 2017.  Most notably, the proxy statements failed to disclose that two major reasons for the MVP Merger and certain charter amendments were (i) to pave the way for an amended advisory agreement designed to benefit Defendant Michael V. Shustek ("Shustek") financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Parking REIT's advisor, MVP Realty Advisors, LLC's ("Advisor"), contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

4.     The proxy statements also failed to disclose that Defendant Shustek had caused MVP REITs I and II to violate Financial Industry Regulatory Authority ("FINRA") rules in connection with underwriting compensation and disclosure thereof in connection with their offerings of stock to the public.

---

[1] Plaintiff's allegations on information and belief are based on Plaintiff's counsels' investigation, which includes review of the Company's regulatory filings, publicly-available news articles, weblog postings, and other publicly-available information.

5.     Parking REIT's Advisor, which also managed MVP REIT II prior to the MVP Merger, is managed and indirectly owned in part by Defendant Shustek, via two entities known as Vestin Realty Mortgage I, Inc. ("VRM I") and Vestin Realty Mortgage II, Inc. ("VRM II"). Shustek owns 15.7% of VRM I, which in turn owns 40% of Advisor.  Shustek also owns 31.8% of VRM II, which in turn owns 60% of Advisor.

6.     In connection with the merger and otherwise, Shustek caused Parking REIT (whose companywide net asset value or "NAV" was only $161.2 million as of May 2018) to pay Advisor $6.8 million in fees in 2017, including asset management fees of $1.2 million, acquisition fees of $1.96 million, and merger fees of $3.6 million.  The $3.6 million was payable as a result of the completion of the MVP Merger.

7.     Not content to collect this steady stream of money over and above the $6.8 million that Advisor extracted from the Company in 2017, Shustek had also set in place a plan to amend the Company's charter to eliminate impediments that stood in the way of an even larger payday. Thus, Shustek caused the Company and MVP REIT I to implement charter amendments that eliminated a provision in the Company's charter providing that "a majority of the Independent Directors may terminate the Advisory Agreement on 60 days' written notice without cause or penalty, and, in such event, the Advisor will cooperate with the Corporation and the Operating Partnership in making an orderly transition of the advisory function."

8.     The charter amendments eliminated any requirement that the Advisor may be terminated "without cause or penalty" and, indeed, essentially gave Parking REIT's Board of Directors carte blanche authority to enter into any advisory arrangement it wishes.

9.     However, the proxy statements seeking shareholder approval for the MVP Merger and charter amendments misleadingly described the purposes of the MVP Merger and related charter amendments as follows:

> The proposed amendments to our charter are primarily intended to accomplish two objectives in connection with the possible listing of our common stock: (1) to remove provisions of our charter that we believe may unnecessarily restrict our ability to take advantage of further opportunities for liquidity events or are redundant with or otherwise addressed or permitted to be addressed under Maryland law; and (2) to amend certain provisions in a manner that we believe would be more suitable for becoming a publicly-traded REIT.

10.     After obtaining approval for the MVP Merger and charter amendments under false pretenses, on September 21, 2018 Shustek then surreptitiously caused the Company to enter into a new Third Amended and Restated Advisory Agreement ("TARAA") with the Advisor that contains multiple terms far less advantageous to the Company than the Second Amended and Restated Advisory Agreement ("SARAA") that it is intended to replace.  The TARAA was negotiated by a special committee of the Board including three members, two of whom are former board members of VRM II.  The TARAA becomes effective upon completion of the Company's listing on the Nasdaq Global Market.

11.     The TARAA provides for a termination fee of up to $21 million payable to Advisor in the event that the Company engages in a change-of-control transaction or internalizes its advisory function.  The SARAA, by contrast, called for no termination fee and could be terminated without cause by the Board on sixty days' notice. This outrageous windfall for Advisor is justified by Defendants in the TARAA as follows: "[i]n recognition of the upfront effort required by the Advisor to structure and acquire our assets and the Advisor's commitment of monies and resources to our business and operations for which the Advisor would be entitled to but, has not received, reimbursement from us, and as consideration for the Advisor's release and performance of its other obligations upon termination of the amended advisory agreement, we will pay the Advisor a termination fee…."

12.     Thus, the Company obtained approval for the necessary charter amendments under false pretenses, then essentially gifted Advisor a materially more advantageous agreement with the Company in exchange for no real consideration.  If Parking REIT completes its Nasdaq listing, Advisor will likely pocket up to $21 million.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act 15 U.S.C. § 78aa, because the claims herein arise under Sections 14(a) and 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the mails and the means and instrumentalities of interstate commerce, including telephonic communications and the Internet.

## PARTIES

16.     Plaintiff is a trust organized under the laws of the State of South Dakota and maintains its business address at 600 Stevens Port Drive, Ste 127, Dakota Dunes, South Dakota. Plaintiff purchased 4,000 shares of MVP REIT II for $100,000 in or about September 2016. Plaintiff has held shares of the Company at all relevant times and currently owns approximately 4,310 shares of Parking REIT, having purchased additional shares through the Company's Distribution Reinvestment Plan. *See* Exh. 1 (PLSRA Certification).

17.     Defendant Parking REIT is a corporation organized and existing under the laws of Maryland having its principal place of business at 8880 West Sunset Blvd., Ste. 240, Las Vegas, Nevada.  As more fully described herein, Parking REIT was previously known as MVP REIT II prior to the MVP Merger and is the surviving entity of the MVP Merger.

18.     Defendant Shustek is and has been Chief Executive Officer and Secretary of the Company since its inception and also serves as Chief Executive Officer of Advisor.  Shustek also served as Chief Executive Officer and a Director of MVP REIT I prior to the MVP Merger, was formerly Chairman of the Company, and currently serves as Chief Executive Officer of VRM I and VRM II.

19.     Defendant Robert J. Aalberts ("Aalberts") is a Director of the Company and previously served as a Director of MVP REIT I prior to the MVP Merger.  Aalberts previously served as a Director of VRM I from January 2006 until January 2008 and as a Director of VRM II from January 2006 until November 2013.

20.     Defendant David Chavez ("Chavez") is a Director of the Company.

1    21.    Defendant John E. Dawson ("Dawson") is a Director of the Company and

2    formerly served as a director of MVP REIT I prior to the MVP Merger.  Dawson was also a

3    Director of Vestin Group from March 2000 until December 2005, was a Director of VRM I from

4    March 2007 until January 2008, and was a Director of VRM II from March 2007 until November

5    2013.

6    22.    Defendant Shawn Nelson ("Nelson") is a Director of the Company and served as

7    a Director of MVP REIT I prior to the MVP Merger.

8    23.    Defendant Nicholas "Nick" Nilsen ("Nilsen") is a Director of the Company and

9    served as a Director of MVP REIT I prior to the MVP Merger.

10    24.    Defendant Allen Wolff ("Wolff") was a Director of the Company until April 29,

11    2018 and also served as a Director of the Company prior to the MVP Merger.

12    25.    Defendants Shustek, Aalberts, Chavez, Dawson, Nelson, Nilsen and Wolff are

13    sometimes collectively referred to below as the "Director Defendants."  The Director Defendants

14    and the Company are sometimes collectively referred to below as "Defendants."

15    **DEFENDANTS' UNLAWFUL COURSE OF CONDUCT AND**

16    **BREACHES OF DUTY**

17    **MVP REIT I –**
**Overview of MVP Monthly Income Realty Trust, Inc.**

18

19    26.    Headquartered in Las Vegas, Nevada, MVP REIT I was formed as a Maryland

20    corporation on April 3, 2012.  As set forth in its Registration Statement filed with the SEC, MVP

21    REIT I was structured as a "hybrid real estate investment trust to invest in a diversified portfolio

22    of real estate secured loans and direct investments in real estate."

23    27.    Formed as a non-traded REIT, MVP REIT I's business was focused on investing

24    in multi-tenant properties including apartment buildings, self-storage facilities and parking lots

25    in the Western and Southwestern United States.  MVP REIT I was sponsored by MVP Capital

26    Partners, LLC ("MVPCP"), a Nevada limited liability company which contributed $200,000 to

27    MVP REIT I in connection with its formation, and previous to MVP REIT I's public offering,

28    was its sole stockholder.

28.   MVPCP was owned and managed by Defendant Shustek, MVP REIT I's Chairman and Chief Executive Officer.  In turn, MVPCP owned 60% of MVP REIT I's external advisor, with the remaining 40% ownership stake in the advisor held by VRM II.

29.   MVP REIT I's external advisor was MVP Realty Advisor, LLC ("MVP REIT I Advisor"), which was formed as a Nevada limited liability company on March 23, 2012.  MVP REIT I Advisor's principals included Defendant Shustek and (nonparty) John Alderfer.  MVP REIT I's advisory relationship; with MVP Realty Advisors, LLC was terminated coincident with the MVP Merger.

30.   While externally managed, MVP REIT I operated under the direction of its board of directors, who were responsible for directing the management of the REIT's business and affairs.  In total, MVP REIT I had five directors.

31.   MVP REIT I's initial directors included the following persons -- four out of five of whom are currently Directors of the Company:

| | |
|---|---|
| Frederick J. Zaffarese Leavitt | Director |
| Michael V. Shustek | CEO, Director |
| Robert J. Aalberts | Director |
| Nicholas Nilsen | Director |
| John E. Dawson | Director |

32.   MVP REIT I's initial executive officers and board members were all affiliated with Vestin Mortgage and its various funds and affiliates, including *inter alia*, VRM II, the 40% owner of MVP REIT I Advisor.

33.   In connection with its public offering, MVP REIT I sought to raise some $550 million in investor equity through the issuance of common stock priced at $9.00 per share. Further, the selling commission on the offering was set at 3.0% of gross offering proceeds. Additional fees were also outlined in the Registration Statement, including but not limited to: (i) a 3% acquisition fee for the purchase of any real estate; (ii) a monthly asset management fee equal to 0.85% of the fair market value of all assets then held by MVP REIT I; and (iii) certain

organizational and offering expenses.  All these expenses were payable to the REIT's external advisor.

34.   MVP REIT I's Registration Statement was declared effective by the SEC on September 25, 2012.  Subsequently, by December 11, 2012, MVP REIT I had reached its minimum offering of $3 million.

35.   By July 2013, MVP REIT I's board of directors had approved changes in its investment strategy to focus significantly on investments in self-storage facilities and parking facilities.  As of December 31, 2012, MVP REIT I had raised approximately $25.5 million through the sale of is its common stock, net of commissions.

36.   In connection with offering shares to the public, MVP REIT I utilized broker-dealer MVP American Securities ("MVP AS"), formerly known as Ashton Garnett Securities, LLC.  MVP AS is an affiliate of MVP REIT I Advisor and is owned by Shustek.

37.   By September 30, 2014, MVP REIT I had sold approximately $31.7 million of its common stock, net of commissions.  By this date, MVP REIT I had acquired seven properties with a total purchase price of approximately $20.4 million (exclusive of closing costs).

38.   MVP REIT I's offering closed in September 2015, with MVP REIT I having received approximately $97.3 million in proceeds on issuance of its common stock.

## MVP REIT II – Overview

39.   Headquartered in San Diego, California, MVP REIT II was formed as a Maryland corporation on May 4, 2015.  MVP REIT II is an UPREIT, or an Umbrella Partnership Real Estate Investment Trust, meaning that the non-traded REIT was structured to conduct business through an operating partnership.  Specifically, MVP REIT II transacted business through MVP REIT II Operating Partnership, LP, a Delaware operating partnership organized on June 8, 2015.

40.   With a similar business focus as MVP REIT I, MVP REIT II was organized in order to focus primarily on parking facilities, including parking lots, parking garages and other parking structures located throughout the United States and Canada.

41.   MVP REIT II was sponsored by MVP Capital Partners II, LLC ("MVPCP II"), a Nevada limited liability company.  Managed by Vestin Mortgage, LLC, MVPCP II was owned

by Vestin Realty Mortgage I, Inc. ("VRM") and VRM II, owners of 40% and 60% of the outstanding membership interests in the sponsor, respectively.

42.    Prior to the MVP Merger (as now), MVP REIT II was externally managed by Advisor.  In similar fashion to MVP REIT I, MVP REIT II was an externally managed non-traded REIT that operated under the direction of its board of directors, who were responsible for directing the management of the REIT's business and affairs.  Initially, MVP REIT II's Directors included the following persons:

| | |
|---|---|
| Michael V. Shustek | CEO, President, Chairman |
| David Chavez | Independent Director |
| John E. Dawson | Independent Director |
| Erik A. Hart | Independent Director |
| Allen Wolff | Independent Director |

Shustek, Chavez and Dawson are currently Directors of the Company. Allen Wolff resigned as a Director of MVP REIT II on April 29, 2018.  Hart resigned on September 14, 2018.

43.    Through its public offering, MVP REIT II sought to raise up to $550 million in investor equity through the issuance of common stock priced at $25 per share.  In connection with the offering, MVP REIT II advisor was paid a selling commission of up to 6.5% of gross offering proceeds.  Furthermore, additional fees as outlined in MVP REIT II's Registration Statement included: (i) a 2.25% acquisition fee for the purchase of any real estate not acquired from an affiliate; (ii) a monthly asset management fee equal to 0.833% of the cost of assets at the end of each month; and (iii) certain organizational and offering expenses.  All these expenses were payable to Advisor.

44.    MVP REIT II's Registration Statement was declared effective by the SEC on October 22, 2015.  Subsequently, by December 31, 2015, MVP REIT II had fulfilled its minimum offering requirement of $2 million in subscriptions and raised approximately $2.4 million in investor equity.

45.    As of May 16, 2016, MVP REIT II had sold approximately 727,993 shares of common stock, thus raising net cash proceeds of approximately $18.2 million in the initial

offering.  As with MVP REIT I, MVP REIT II relied upon affiliated broker-dealer MVP AS to sell shares.

46.     By September 30, 2016, MVP REIT II had raised approximately $44.9 million in proceeds in connection with its offering.

**Shustek Causes MVP REITs I and II to
Violate FINRA Rules**

47.     On April 3, 2018, through filing a Form 12b-25 with the SEC, the Company first notified its investors and the public of its inability to timely file its 2017 annual report per Form 10-K.  Specifically, Parking REIT disclosed that, as of February 2018, its Audit Committee had "[e]ngaged legal counsel to conduct an internal investigation arising from the Audit Committee's receipt of allegations from an employee of MVP Realty Advisors, LLC … regarding possible wrongdoing by the Registrant's Chairman and Chief Executive Officer, Michael V. Shustek…."

48.     Thus, it was only in April 2018 that Company investors first learned of the fact that an unnamed employee whistleblower had reportedly informed Parking REIT's Audit Committee of certain material inaccuracies that had been disseminated to the FINRA in connection with MVP REIT I and MVP REIT II's offerings.

49.     As further described in the Form 12b-25, the allegations surrounding Defendant Shustek were two-fold in nature.  First, the allegations concerned "potentially inaccurate disclosures by [MVP AS], the broker-dealer affiliated with the Advisor, to [FINRA] relating to total underwriting compensation paid by the Advisor and its affiliates (other than Registrant) in connection with the initial public offerings of MVP REIT, Inc. and the Registrant."

50.     Second, the allegations raised in Parking REIT's Form 12b-25 disclosure concerned "potential inaccuracies in personal financial statements of Shustek that were provided to one or more of the Registrant's lenders in connection with mortgage loans or guarantees where Shustek is a personal non-recourse carve-out guarantor."

51.     Subsequent to its Form 12b-25 disclosure, the Company filed an 8-K on May 3, 2018.  Through this 8-K filing, Parking REIT disclosed that as of April 27, 2018, the Company's Audit Committee had concluded its internal investigation into the whistleblower's allegations.

Specifically, through this 8-K, the Company first disclosed that, based upon the information made available to the Audit Committee: "Mr. Shustek did not exercise proper judgment and appropriate oversight in connection with the initial submission of underwriting compensation information to FINRA and personal financial statements to the Company's lenders, which resulted in the submission of inaccurate information to FINRA and the Company's lenders."

52.     In addition to the Company's disclosure conceding that Mr. Shustek had failed to exercise proper judgment, thus causing the dissemination of inaccurate material information to both FINRA and Company lenders, Parking REIT also disclosed that on April 29, 2018, the Board had received a letter of resignation from Defendant Allen Wolff.

53.     Prior to his resignation, Allen Wolff had been a member of the Company's Audit Committee.  Following Mr. Wolff's resignation, the Board filled his vacancy on the Audit Committee with Defendant Nielsen.

54.     As further disclosed in the Company's May 3, 2018 8-K conceding that Shustek had exercised poor judgment and failed to apply appropriate oversight in connection with the dissemination of information to FINRA and Company lenders, Parking REIT's Board adopted certain recommendations made by the Audit Committee, aimed at improving the Company's corporate governance.

55.     Among those recommendations made by the Audit Committee and adopted by Parking REIT's Board were recommendations to:

- Regularly evaluate the Board's composition for, among other things, independence;
- Require the Chief Financial Officer to also report directly to the Board and to meet independently with the Board at a regularly scheduled meeting, to be held at least quarterly; and
- Assess and evaluate, at least on an annual basis, potential additional corporate governance enhancements with the advice of outside legal counsel.

56.     Shortly following the Company's May 3, 2018 8-K disclosure notifying of certain approved corporate governance measures -- including the newly implemented requirement that

the Chief Financial Officer report directly to the Board at least quarterly -- Parking REIT filed another 8-K on May 11, 2018. Specifically, through its May 11, 2018 8-K filing with the SEC, the Company disclosed its intention to terminate then-CFO Edwin Bentzen IV, insofar as the Company was declining to renew Mr. Bentzen's employment agreement, set to expire on June 13, 2018.

57.     On May 31, 2018, the Company's Board approved the non-renewal of Mr. Bentzen's employment agreement in his capacity as Parking REIT CFO. On the same day, the Company approved Mr. Brandon Welch as the interim CFO of Parking REIT.

58.     At the time of his appointment, Mr. Welch, age 35, had been employed with MVP Realty Advisors since the inception of MVP REIT I in 2012. Further, Mr. Welch is the son-in-law of Shustek.

59.     On June 22, 2018, Parking REIT filed its 2017 annual report on Form 10-K. Within the 10-K, the Company disclosed that "[FINRA] is currently conducting an investigation of [MVP AS], a firm that was previously a registered broker-dealer."

60.     As further disclosed in the 2017 annual report, FINRA's information requests to MVP AS largely concerned "[c]ompliance with the limitations in FINRA rules on underwriting compensation and offering and organizational expenses." Specifically, the Company conceded that "aggregate underwriting compensation in its initial public offering and the initial public offering of MVP REIT I, as computed in accordance with FINRA rules, exceeded the applicable limits permitted by FINRA rules."

61.     These violations were not disclosed to MVP REIT I and II shareholders in the proxy statements disseminated to seek approval of the MVP Merger (as defined below), although they had occurred prior to the dissemination of the proxy statements.

### The MVP Merger

62.     On December 31, 2016, MVP REIT II ceased all selling efforts for its initial public offering of shares of common stock at $25.00 per share. The Company accepted additional subscriptions through March 31, 2017, the last day of the initial public offering, and raised a total approximately $61.3 million in the initial public offering before payment of

1   deferred offering costs of approximately $1.1 million, contribution from an affiliate of the

2   Advisor of approximately $1.1 million and cash distributions of approximately $1.8 million.

3        63.    On May 1, 2017, MVP REITs I and II jointly announced that, following review

4   of strategic alternatives, "a special committee of the board of directors of MVP I ... has accepted

5   a non-binding Letter of Intent ("LOI") from MVP REIT II regarding a proposed merger of MVP

6   I with MVP REIT II."

7        64.    On May 26, 2017, the Company announced a merger agreement for the merger

8   of two nontraded REITs, MVP REIT I, and MVP REIT II.

9        65.    In a joint press release, MVP REITs I and II announced that "after reviewing

10  strategic alternatives, a special committee of the board of directors of MVP I (the 'MVP I Special

11  Committee') has accepted a non-binding Letter of Intent ('LOI') from MVP II regarding a

12  proposed merger of MVP I with MVP II." The press release added that the merger consideration

13  payable by MVP REIT II to each holder of common stock MVP REIT I would be 0.365 shares

14  of the Company's common stock.

15       66.    In connection with the proposed merger, MVP REIT I also announced that it

16  would suspend its distribution reinvestment plan and share repurchase plan pending the

17  consummation of the proposed merger. The merger was to be effectuated via MVP REIT I's

18  merger with and into a wholly-owned merger subsidiary of MVP REIT II.

19       67.    On December 15, 2017, the merger was consummated. At the effective time of

20  the merger, and pursuant to the terms of the merger agreement, each share of MVP REIT I

21  common stock that was issued and outstanding immediately prior to the merger was converted

22  into the right to receive 0.365 shares of Company common stock. The Company was renamed

23  "The Parking REIT, Inc." following the merger.

24       68.    A total of approximately 3.9 million shares of Company common stock were

25  issued to former MVP REIT I stockholders. Former MVP REIT I stockholders, immediately

26  following the merger, owned approximately 59.7% of the Company's common stock.

27  / / /

28  / / /

**The False and Misleading Proxy Statements**

69.     The MVP Merger was effectuated via separate false and misleading proxy statements disseminated to shareholders of MVP REITs I and II, respectively on or about August 21, 2017.

70.     The proxy statement on Schedule 14A disseminated to MVP REIT II shareholders ("MVP II Proxy Statement") describes the purposes of the MVP Merger and related charter amendments as follows:

> The proposed amendments to our charter are primarily intended to accomplish two objectives in connection with the possible listing of our common stock: (1) to remove provisions of our charter that we believe may unnecessarily restrict our ability to take advantage of further opportunities for liquidity events or are redundant with or otherwise addressed or permitted to be addressed under Maryland law and (2) to amend certain provisions in a manner that we believe would be more suitable for becoming a publicly-traded REIT. The majority of the changes to our charter that we are proposing relate to the removal or revision of provisions and restrictions that were required by state securities administrators in order for us to publicly offer shares of our stock without having it listed on a national securities exchange. If our common stock is listed on a national securities exchange, these provisions and restrictions will no longer be required and, in some cases, if retained, would place restrictions on our activities that could put us at a competitive disadvantage compared to our peers with publicly listed securities.

71.     This deliberately vague and materially misleading statement in the MVP II Proxy Statement failed to disclose that two major reasons for the MVP Merger and certain charter amendments were (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

72.     In fact, the charter amendments approved pursuant to the MVP II Proxy Statement were expressly designed to pave the way for the Company's entry into the TARAA- the terms of which were expressly prohibited by MVP REIT II's original charter.  The original charter provided as follows: "Section 8.5 <u>Termination</u>. A majority of the Independent Directors may terminate the Advisory Agreement on 60 days' written notice without cause or penalty, and,

1   in such event, the Advisor will cooperate with the Corporation and the Operating Partnership in

2   making an orderly transition of the advisory function."

3         73.    Further, Article VIII of the initial charter provided that the Advisor acts as a

4   fiduciary to the Company and provided detailed guidance for the Board of Directors to supervise

5   the Advisor's performance and compensation.

6         74.    The charter amendments approved via the MVP II Proxy Statement gut these

7   protections- eliminating any requirement that the Advisor may be terminated "without cause or

8   penalty" and, indeed, deleting Article VIII of the original charter in its entirety.  The only

9   substantive mention of the Advisor in the Company's charter as amended essentially gives the

10   Board of Directors carte blanche authority to enter into any advisory arrangement it wishes.  The

11   relevant language is as follows:

> Section 7.8 <u>Advisor Agreements</u>. Subject to such approval of Stockholders and other conditions, if any, as may be required by any applicable statute, rule or regulation, the Board of Directors may authorize the execution and performance by the Corporation of one or more agreements with any person, corporation, association, company, trust, partnership (limited or general) or other organization whereby, subject to the supervision and control of the Board of Directors, any such other person, corporation, association, company, trust, partnership (limited or general) or other organization shall render or make available to the Corporation managerial, investment, advisory and/or related services, office space and other services and facilities (including, if deemed advisable by the Board of Directors, the management or supervision of the investments of the Corporation) upon such terms and conditions as may be provided in such agreement or agreements (including, if deemed fair and equitable by the Board of Directors, the compensation payable thereunder by the Corporation).

21         75.    Thus, far from being ministerial or housekeeping amendments to the charter to

22   prepare the Company for a public listing, in fact the amendments were expressly targeted to give

23   the Board the unfettered discretion to enter into the onerous TARAA and gift Advisor a

24   materially more advantageous agreement with the Company in exchange for no real

25   consideration.  Defendants deliberately concealed the true purpose of the charter amendments

26   in the MVP II Proxy Statement in order to obtain shareholder approval of same under false

27   pretenses.

28   / / /

76.     MVP REIT I filed a Proxy Statement/Prospectus with the SEC on August 16, 2017 ("MVP I Proxy Statement") that contains language identical to that set forth in ¶ 74, *supra*, concerning Advisor Agreements and also failed to disclose the true purpose of the charter amendments to MVP REIT II's charter.

77.     Both the MVP I Proxy Statement and the MVP II Proxy Statement were also false and misleading due to their failure to disclose that Shustek had caused MVP REITs I and II to Violate FINRA rules (as alleged in detail above at ¶¶ 47-62.

<u>**The Company Terminates Its Private Offering and**</u>
<u>**Suspends Distributions**</u>

78.     On February 7, 2018, the Company filed a Form 8-K with the SEC, disclosing that as of February 6, 2018, Parking REIT had "completed its private placement of the Company's Series 1 Convertible Redeemable Preferred Stock ('Series 1 Stock') and corresponding warrants to purchase 35 shares of the Company's common stock for every $1,000 of Series 1 Stock subscribed (the 'Warrants')."

79.     Thus, as of the close of Parking REIT's private offering of stock in early February 2018 -- conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, and Regulation D ("Reg D") promulgated thereunder – "the Company sold a total of approximately 39,810 shares of its Series 1 stock, along with the corresponding Warrants representing in aggregate the right to purchase 1,382,605 shares of the Company's common stock, to accredited investors for total gross proceeds of approximately $39,810,928."

80.     In connection with Parking REIT's private offering to accredited investors pursuant to Reg D, the Company paid, in aggregate, approximately $2,299,000 in selling commissions, approximately $709,000 in managing broker dealer fees, and approximately $466,000 in expense reimbursements related to due diligence on the private offering.

81.     Subsequent to the termination of its private offering, on March 23, 2018, the Company issued a press release announcing the suspension of cash distributions and stock dividends to holders of Parking REIT's common stock, effective immediately.

/ / /

**The Third Amended and Restated Advisory Agreement and
the Proposed Listing**

82.    In connection with the MVP Merger and otherwise, Shustek caused Parking REIT (whose companywide NAV was only $161.2 million as of May 2018) to pay Advisor $6.8 million in fees in 2017, including asset management fees of $1.2 million, acquisition fees of $1.96 million, and merger fees of $3.6 million.  The $3.6 million was payable as a result of the completion of the MVP Merger.

83.    Advisor now gets 1.1% of the Company's asset value per year as a management fee, capped at $2 million a year unless Parking REIT reaches an aggregate asset value of $500 million under the SARAA, which is the current operative management agreement.  Like the initial agreement between MVP REIT II and Advisor, the terms of the SARAA include the Board's ability to terminate Advisor without cause or penalty on 60 days' written notice.

84.    Under the guise of permitting the Company to engage in an internalization of the advisory function after a public listing of the Parking REIT's shares, on September 21, 2018 Shustek then surreptitiously caused the Company to enter into a new advisory agreement -- the TARAA -- with the Advisor that contains multiple terms far less advantageous to the Company than the SARAA that it is intended to replace.  The TARAA was negotiated by a special committee of the Board including three members, two of whom are former board members of VRM II.  The TARAA becomes effective upon completing of the Company's listing on Nasdaq.

85.    The TARAA provides for a termination fee of up to $21 million payable to Advisor in the event that the Company engages in a change-of-control transaction or internalizes its advisory function.  The SARAA, by contrast, called for no termination fee.  This outrageous windfall for Advisor is justified by Defendants as follows: "In recognition of the upfront effort required by the Advisor to structure and acquire our assets and the Advisor's commitment of monies and resources to our business and operations for which the Advisor would be entitled to but, has not received, reimbursement from us, and as consideration for the Advisor's release and performance of its other obligations upon termination of the amended advisory agreement, we will pay the Advisor a termination fee… ."

86.   This disingenuous and underhanded rationale for the Board's decision ignores the fact that the Company was contractually entitled to terminate the SARAA without cause or penalty, leaving the field open for internalization of the advisory function, retention of another outside advisor, or another course of action.  Further, Advisor was already contractually bound to cooperate with the Company in the event of termination.  As set forth in ¶ 8(b) of the SARAA:

(b) The Advisor shall promptly upon termination:

(i) pay over to the Company and the Operating Partnership all money collected and held for the account of the Company and the Operating Partnership pursuant to this Agreement, after deducting any accrued compensation and reimbursement for its expenses to which it is then entitled;

(ii) deliver to the Board a full accounting, including a statement showing all payments collected by it and a statement of all money held by it, covering the period following the date of the last accounting furnished to the Board;

(iii) deliver to the Board all assets, including all investments, and documents of the Company and the Operating Partnership then in the custody of the Advisor; and

(iv) cooperate with the Company and the Operating Partnership to provide an orderly management transition.

87.   In short, the TARAA amounts to an enormous gratuity for Advisor and, indirectly, its owners including VRM I, VRM II and Shustek.  If Parking REIT completes its Nasdaq listing, nothing prevents Shustek from causing the Company either to engage in a change-of-control transaction or to internalize its advisory function, nominally moving the employees of Advisor to an "internal" role and essentially keeping the same management in place.  Either course of action would result in Advisor pocketing up to $21 million.  $21 million represents over 13% of the Company's reported net value of $161.2 million as of May 2018. Further, the payment would represent compensation over and above the $6.8 million in fees paid to Advisor in 2017 -- itself over 4% of the Company's reported NAV.

88.   At least one (now former) Parking REIT Director appears to have objected to the TARAA.  On September 14, 2018, former Director and relevant non-party Erik Hart resigned shortly before the TARAA was publicly announced, stating in a letter to the Board that he was

resigning in part "because, on September 12 [2018], the Board passed a significant amendment…
to the advisory agreement… ."   Hart went on to express concerns that under the TARAA
"instead of being able to terminate the advisor… and our CEO, Mike Shustek, with sixty days'
notice with no automatic costs to shareholders, the Board has now agreed to an internalization
or termination fee of between sixteen and twenty-one million dollars payable to the Advisor."

89.   Hart also complained about his exclusion from a Board meeting at which the
TARAA was to be considered and indicated that other Board members on the Nominating
Committee had decided not to allow him to stand for re-election to the Board because of "the
lack of control the CEO, Michael Shustek, and the Chairman of the Board had over my
participation in board meetings."

90.   On October 9, 2018, Parking REIT announced that it has applied to list its
common stock on the NASDAQ Global Market under the symbol "PARK."   In a preliminary
prospectus filed with the SEC, the Company did not give specifics regarding the size of the
offering or a price per share.   No fixed date has been given for the Company's Nasdaq listing,
but the TARAA will become effective immediately upon completion of the listing and will likely
result in an enormous windfall to Advisor, and losses to Plaintiff and the Class, of up to $21
million in the event the listing is completed.   All of these losses were proximately caused by the
false and misleading statements and actions on the part of Defendants.

## CLASS ACTION ALLEGATIONS

91.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure ("FRCP").   The Class in this action ("Class") consists of all public
shareholders of the Company and MVP REIT I between August 11, 2017 and December 15,
2017 (the "Class Period").

92.   Thousands of persons are believed to be members of the putative class ("Class"),
and those persons or entities are geographically dispersed.   Therefore, joinder is impracticable
pursuant to FRCP Rule 23(a)(1).

93.   Common issues of fact or law predominate over individual issues within the
meaning of FRCP Rule 23(a)(2). Common issues of law and fact include but are not limited to:

1        (i) whether the federal securities laws were violated by the Defendants' respective

2        acts as alleged herein;

3        (ii) whether the Defendants breached fiduciary duties to Plaintiff and the Class;

4        (iii) whether the MVP I Proxy Statement and the MVP II Proxy Statement were

5        false and misleading;

6        (iv) whether the members of the Class have sustained damages and, if so, what is

7        the proper measure of damages.

8    94.    Plaintiff's interests are typical of, and antagonistic to, the interest of the Class.

9    95.    Plaintiff has retained competent counsel experienced with class actions and

10 complex litigation and intends to vigorously prosecute this action.

11    96.    Common issues predominate.  A class action is superior to all other methods for

12 the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method

13 by which Plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication

14 of their claims.

15    97.    The size of individual damages is small in comparison to the complexity and

16 scope of the Defendants' alleged unlawful conduct.  Plaintiff does not anticipate any difficulties

17 in the management of this action as a class action.

18
19
**FIRST CLAIM FOR RELIEF**
**(Claim for Violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 –**
**Against All Defendants)**

20    98.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

21    99.    Defendants disseminated the false and misleading MVP I Proxy Statement and

22 MVP II Proxy Statement, which contained statements that were false and misleading and, in

23 light of the circumstances under which they were made, omitted to state material facts necessary

24 to make the statements there not materially false or misleading, in violation of Section 14(a) of

25 the 1934 Act and SEC Rule 14a-9.

26    100.    The MVP I Proxy Statement and the MVP II Proxy Statement were prepared,

27 reviewed, and/or disseminated by Defendants.  By virtue of their positions, the Director

28

Defendants were aware of the omitted information and their duty to disclose this information in MVP I Proxy Statement and MVP II Proxy Statement.

101.    The Director Defendants were at least negligent in filing and disseminating the MVP I Proxy Statement and the MVP II Proxy Statement containing the misstatements and omissions of material fact set forth herein.

102.    The omissions and misleading statements in the MVP I Proxy Statement and MVP II Proxy Statement are material in that a reasonable shareholder would have considered them important in considering the merits of the MVP Merger and related charter amendments.

103.    In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the MVP I Proxy Statement and MVP II Proxy Statement, and in light of other information reasonably available to shareholders.

104.    The MVP I Proxy Statement and MVP II Proxy Statement were an essential link in accomplishing the MVP Merger and gaining shareholder approval of related charter amendments.

105.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9.

106.    Plaintiff and the Class were damaged by Defendants violations of Section 14(a) of the 1934 Act and Rule 14a-9.  The false statements and omissions as set forth above proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.  Any listing of Parking REIT's shares or change of control transaction such as a merger will result in damages to Plaintiff and the Class of approximately $21 million.  Further, no listing of the Company's shares or subsequent sale of Class members' shares in connection with a change of control event or otherwise can now occur without this approximately $21 million in damages being realized.  Thus, Defendants have effectively levied a 13% tax on any sale of shares in Parking REIT by Plaintiff and the Class.

107.    Further, Plaintiff and the Class will be irreparably harmed by any listing of the Company's shares.

**SECOND CLAIM FOR RELIEF**
**(Claim for Violation of Section 20(a) of the 1934 Act – Against the Director Defendants)**

108.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

109.    The Director Defendants acted as controlling persons of Parking REIT and MVP REIT I within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the MVP I Proxy Statement and MVP II Proxy Statement, filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

110.    Each of the Director Defendants was provided with or had unlimited access to copies of the MVP I Proxy Statement and MVP II Proxy Statement, alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

111.    In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of MVP REIT I and/or the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The MVP I Proxy Statement and MVP II Proxy Statement, contain the unanimous recommendation of the Director Defendants to approve the MVP Merger.  They were thus directly connected with and involved in the making of the MVP I Proxy Statement and MVP II Proxy Statement.

112.    By virtue of the foregoing, the Director Defendants violated Section 20(a) of the 1934 Act.

113.    As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.

114.     As a direct and proximate result of defendants' conduct, Plaintiff and the Class have been damaged as set forth above, and are threatened with irreparable harm.

### THIRD CLAIM FOR RELIEF
**(Claim for Breach of Fiduciary Duty – Against the Director Defendants)**

115.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

116.     The Director Defendants owed and owe Plaintiff and the Class fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe Plaintiff and the Class the highest obligations of good faith, fair dealing, loyalty and due care, as well as a duty to disclose material facts in connection with requested shareholder action.

117.     By virtue of their conduct and omissions alleged herein, Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, disclosure, good faith and supervision.

118.     Each of the Director Defendants had actual or constructive knowledge that the two true major reasons for the MVP Merger and certain charter amendments were (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

119.     However, despite this knowledge, the Director Defendants caused or permitted the MVP Merger and related charter amendments that have damaged Plaintiff and the Class. They also caused and/or permitted the filing and disseminating the MVP I Proxy Statement and the MVP II Proxy Statement containing the misstatements and omissions of material fact set forth herein.   These actions could not have been a good faith exercise of prudent business judgment, or fiduciary oversight.

120.     As a direct and proximate result of the Director Defendants' misconduct and breaches of fiduciary duty, Plaintiff and the Class have suffered and will continue to suffer significant damages.

# JURY DEMAND

121.    Plaintiff demands a trial by jury on all claims so triable.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongful acts;

B.    Enjoining Parking REIT's listing on Nasdaq Global Market;

C.    Declaring that Defendants violated Sections 14(a) and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

D.    Awarding to Plaintiff the costs and disbursements of the action, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

DATED this 12th day of March, 2019

*LAW OFFICE OF HAYES & WELSH

By:    _/s/  Martin L. Welsh_
MARTIN L. WELSH, ESQ. (NB # 8720)
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone: (702) 434-3444
Facsimile (702) 434-3739
Email: mwelsh@lvlaw.com

*LEVI & KORSINSKY LLP
Donald J. Enright, Esq.
(Counsel will Comply with LR IA 11-2 Within 45 Days)
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121
Email: denright@zlk.com

*LAW OFFICE OF CHRISTOPHER J. GRAY P.C.
Christopher J. Gray, Esq.
(Counsel will Comply with LR IA 11-2 Within 45 Days)
360 Lexington Ave, 14th Floor
New York, New York 10017
Telephone: (866) 966-9598
Facsimile: (212) 937-3139
Email: chris@investorlawyers.net

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*LAW OFFICES OF JOSHUA B. KONS, LLC
Joshua B. Kons, Esq.
(Counsel will Comply with LR IA 11-2 Within 45 Days)
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Telephone: (860) 920-5181
Facsimile: (860) 920-5174
Email: joshuakons@konslaw.com

* Counsel for Plaintiff
*SIPDA REVOCABLE TRUST, by Trenton J. Warner, Director,
on behalf of itself and all others similarly situated*