THE LAW OFFICE OF HAYES & WELSH
Martin L. Welsh, Esq. (Bar No. 8720)
199 N. Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone: (702) 434-3444
Facsimile:  (702) 434-3739
Email: mwelsh@lvlaw.com

LEVI & KORSINSKY LLP
Donald J. Enright, Esq. (Admitted This Case Only)
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile:  (202) 333-2121
Email: denright@zlk.com

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SIPDA REVOCABLE TRUST, by Trenton J. Warner, Trustee, on behalf of itself and all others similarly situated,<br><br>    Plaintiffs,<br><br>    - vs. -<br><br>THE PARKING REIT, INC., MICHAEL V. SHUSTEK, ROBERT J. AALBERTS, DAVID CHAVEZ, JOHN E. DAWSON, SHAWN NELSON, NICHOLAS NILSEN, WILLIAM WELLS and ALLEN WOLFF,<br><br>    Defendants. | Case No.: 2:19-cv-00428-APG-BNW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff SIPDA Revocable Trust by Trenton J. Warner, Director ("Plaintiff"), as and for

its First Amended Class Action Complaint against The Parking REIT, Inc., Michael V. Shustek,

Robert J. Aalberts, David Chavez, John E. Dawson, Shawn Nelson, Nicholas Nilsen, William Wells, and Allen Wolff, alleges upon information and belief[1] as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this class action against The Parking REIT, Inc. ("Parking REIT" or "the Company") and certain of its current and former officers and directors on behalf of all public shareholders of the Company and MVP Monthly Income Realty Trust, Inc. ("MVP REIT I") between August 11, 2017 and April 1, 2019 ("Class").

2.     This action seeks damages in connection with Defendants' use of false and misleading proxy statements to obtain shareholder approval for the merger (the "MVP Merger") of Parking REIT (then known as MVP REIT II, Inc.) and MVP REIT I, as well as a subsequent false and misleading proxy statement that was an essential link in Parking REIT's internalization of its advisory function ("Internalization").  The MVP Merger was announced in May 2017 and was consummated on December 15, 2017.  The Internalization was completed on April 1, 2019.

3.     This action involves a series of transactions that were designed and intended at all relevant times to transfer wealth and value from the stockholders of MVP REIT I, MVP REIT II, and Parking REIT to Defendant Michael V. Shustek ("Shustek") and his affiliates by looting these companies.  First through the MVP Merger, then through the Internalization, Defendants engaged in unmitigated stripping of value from these companies to Shustek and entities that he controls.  Defendants have accomplished this wealth transfer by: (i) causing Parking REIT to pay Parking REIT's advisor, MVP Realty Advisors, LLC's ("Advisor"), in which Shustek has a

---

[1] Plaintiff's allegations on information and belief are based on Plaintiff's counsel's investigation, which includes review of the Company's regulatory filings, publicly available news articles, weblog postings, and other publicly available information.

-2-

substantial indirect ownership interest, a $3.6 million "merger fee" that the Company was not legally obligated to agree to pay; (ii) causing Parking REIT to agree to issue 1.6 million shares of stock ostensibly worth $40,160,000, to Advisor in connection with the Internalization, despite the fact that Parking REIT was under no obligation to pay Advisor any fees whatsoever to terminate Advisor's contract; and (iii) causing Parking REIT to assume over $17 million in debt accumulated by Advisor, and owed to Shustek-controlled entities, in connection with the Internalization and in exchange for assuming assets of negligible value.

4.      The MVP Merger was effectuated via separate false and misleading proxy statements disseminated to shareholders of MVP REITs I and II, respectively, on or about August 21, 2017 ("August 2017 Proxies").  Most notably, the August 2017 Proxies failed to disclose that two major reasons for the MVP Merger and certain charter amendments were: (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

5.      The August 2017 Proxies also failed to disclose that Shustek had caused MVP REITs I and II to violate Financial Industry Regulatory Authority ("FINRA") rules in connection with underwriting compensation and disclosure thereof in connection with the REITs' offerings of stock to the public.

6.      Advisor, which manages Parking REIT and also managed MVP REITs I and II prior to the MVP Merger, is managed and indirectly owned in part by Shustek via two entities known as Vestin Realty Mortgage I, Inc. ("VRM I") and Vestin Realty Mortgage II, Inc. ("VRM

II"). Shustek owns 15.7% of VRM I, which in turn owns 40% of Advisor. Shustek also owns 31.8% of VRM II, which in turn owns 60% of Advisor.

7.      In connection with the merger and otherwise, Shustek caused Parking REIT (whose companywide net asset value or "NAV" was only $161.2 million as of May 2018) to pay Advisor $6.8 million in fees in 2017, including asset management fees of $1.2 million, acquisition fees of $1.96 million, and merger fees of $3.6 million. The August 2017 Proxies did not disclose that MVP REIT I and MVP REIT II were not under any legal obligation to agree to pay Advisor any merger fee to effectuate the MVP Merger. Thus the $3.6 million merger fee amounted to a gratuity paid at the expense of Parking REIT and to the financial benefit of Advisor and, indirectly, Shustek.

8.      After the MVP Merger was completed in December 2017, Defendants continued to pave the way for an internalization transaction that would benefit Shustek financially. A subsequent proxy statement for the combined company (now known as the Parking REIT), dated August 20, 2018 ("August 2018 Proxy"), failed to disclose material facts that rendered statements therein false and misleading. Although Shustek's secret plan to internalize Advisor, enrich himself via issuance of Parking REIT stock to Advisor, saddle the Company with Advisor's $17.4 million in debts, and lock in a lucrative employment contract for himself was well underway, the August 2018 proxy did not disclose this secret plan. Indeed, it failed to mention the planned Internalization at all.

9.      When attempts to list Parking REIT on Nasdaq Global Market foundered, Shustek and his captive board of directors essentially switched to "Plan B" and set about to internalize Parking REIT's advisory function without a listing- but still on financial terms hugely unfair to Parking REIT, and amounting to an enormous windfall for Advisor.

10.     As part of the Internalization Agreements (as defined below), among other things, the Company agreed with the Advisor to: (i) acquire and assume substantially all of the Advisor's assets and liabilities; (ii) terminate Parking REIT's advisory agreement with Advisor; (iii) extend employment to the executives and other employees of the Advisor; (iv) arrange for the Advisor to continue to provide certain services with respect to outstanding indebtedness of the Company and its subsidiaries; and (v) lease the employees of the Advisor for a limited period of time prior to the time that such employees become employed by the Company.

11.     As part of those same agreements, the Company agreed to issue to the Advisor over a period of more than two and a half years 1.6 million shares of the Company's common stock as consideration under the terms of the Internalization Agreement.  The consideration is issuable in four equal installments.  The first installment of 400,000 shares of common stock was issued on April 1, 2019, the Effective Date of the Internalization Agreements.  The remaining installments will be issued on December 31, 2019, 2020, and 2021 (or if December 31st is not a business day, the last business day of such year).  These 1.6 million shares of stock are ostensibly worth $40,160,000 based on the Company's reported NAV per share of $25.10 as of May 15, 2019.  Thus, the issuance of the shares would cause substantial dilution to existing shareholders, as Parking REIT's reported companywide NAV is only $174,094,000 as of May 28, 2019.  The cost of issuing the 1.6 million shares of Parking REIT stock to Advisor pursuant to the Internalization is somewhat mitigated by the Company's right to repurchase up to 1.1 million shares from Advisor for $17.50 a share.  However, even taking this into account, the total value of the stock consideration payable to Advisor under the Internalization would be at least $31,800,000 based on the Company's reported estimated NAV of $25.10 a share.

12.     Perhaps most surprisingly and onerously, entities that own Advisor (defined above as VRM I and VRM II) in which Shustek has a substantial ownership interest, were *owed* very substantial sums by Advisor.  Shustek and the compliant Company Board of Directors ("Board") caused Parking REIT to assume these liabilities in connection with the Internalization. As of September 2016, VRM II had lent approximately $12.9 million to Advisor.  At relevant times, VRM II had written down these loans' value but had not forgiven them.  VRM I had also lent approximately $4.5 million to Advisor of September 2016.   Thus, Advisor owed approximately $17.4 million in total to VRM I and VRM II.  Since these debts were not listed as retained liabilities, the Company therefore apparently assumed these debts on April 1, 2019 pursuant to the Internalization Agreement when it internalized Advisor (along with all of Advisor's other liabilities and purported assets).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act 15 U.S.C. § 78aa, because the claims herein arise under Sections 14(a) and 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the mails and the means and instrumentalities of interstate commerce, including telephonic communications and the Internet.

## PARTIES

16.     Plaintiff is a trust organized under the laws of the State of South Dakota and maintains its business address at 600 Stevens Port Drive, Ste 127, Dakota Dunes, South Dakota. Plaintiff purchased 4,000 shares of MVP REIT II for $100,000 in or about September 2016. Plaintiff has held shares of the Company at all relevant times and currently owns approximately 4,310 shares of Parking REIT, having purchased additional shares through the Company's Distribution Reinvestment Plan.   On June 13, 2019, the Court appointed Plaintiff as Lead Plaintiff to represent the interests of the Class herein.  *See* ECF No. 29.

17.     Defendant Parking REIT is a corporation organized and existing under the laws of Maryland having its principal place of business at 8880 West Sunset Blvd., Ste. 240, Las Vegas, Nevada.  As more fully described herein, Parking REIT was previously known as MVP REIT II prior to the MVP Merger and is the surviving entity of the MVP Merger.

18.     Defendant Shustek is and has been Chief Executive Officer and Secretary of the Company since its inception and serves as Chief Executive Officer of Advisor.  Shustek also served as Chief Executive Officer and a Director of MVP REIT I prior to the MVP Merger, was formerly Chairman of the Company, and currently serves as Chief Executive Officer of VRM I and VRM II.

19.     Defendant Robert J. Aalberts ("Aalberts") is a Director of the Company and previously served as a Director of MVP REIT I prior to the MVP Merger.  Aalberts previously served as a Director of VRM I from January 2006 until January 2008 and as a Director of VRM II from January 2006 until November 2013.

20.     Defendant David Chavez ("Chavez") is a former Director of the Company who served as a Director from the time of Parking REIT's formation (as MVP REIT II) in May 2015 until 2019, when he did not stand for reelection.

21.     Defendant John E. Dawson ("Dawson") is a Director of the Company and formerly served as a director of MVP REIT I prior to the MVP Merger.  Dawson was also a Director of a related company known as Vestin Group from March 2000 until December 2005, a Director of VRM I from March 2007 until January 2008, and a Director of VRM II from March 2007 until November 2013.

22.     Defendant Shawn Nelson ("Nelson") is a Director of the Company and served as a Director of MVP REIT I prior to the MVP Merger.

23.     Defendant Nicholas "Nick" Nilsen ("Nilsen") is a Director of the Company and served as a Director of MVP REIT I prior to the MVP Merger.

24.     Defendant William Wells ("Wells") is a Director of the Company and has served as a Director since May 31, 2018, and at the time of the issuance of the August 2018 Proxy.

25.     Defendant Allen Wolff ("Wolff") was a Director of the Company until April 29, 2018 and served as a Director of the Company prior to the MVP Merger.  Defendants Shustek, Aalberts, Chavez, Dawson, Nelson, Nilsen, Wells, and Wolff are sometimes collectively referred to below as the "Director Defendants."  The Director Defendants and the Company are sometimes collectively referred to below as "Defendants."

**DEFENDANTS' UNLAWFUL COURSE OF CONDUCT AND BREACHES OF DUTY**

**MVP REIT I –
Overview of MVP Monthly Income Realty Trust, Inc.**

26.     Headquartered in Las Vegas, Nevada, MVP REIT I was formed as a Maryland corporation on April 3, 2012.  As set forth in MVP REIT I's Registration Statement filed with the Securities and Exchange Commission ("SEC"), MVP REIT I was structured as a "hybrid real estate investment trust to invest in a diversified portfolio of real estate secured loans and direct investments in real estate."

27.     Formed as a non-traded real estate investment trust ("REIT"), MVP REIT I's business was focused on investing in multi-tenant properties including apartment buildings, self-storage facilities, and parking lots in the Western and Southwestern United States.  MVP REIT I was sponsored by MVP Capital Partners, LLC ("MVPCP"), a Nevada limited liability company that contributed $200,000 to MVP REIT I in connection with its formation, and prior to MVP REIT I's public offering, was its sole stockholder.

28.     MVPCP was owned and managed by Shustek, who at the time was also MVP REIT I's Chairman and Chief Executive Officer.  In turn, MVPCP owned 60% of MVP REIT I's external advisor, with the remaining 40% ownership stake in the advisor held by VRM II.

29.     MVP REIT I's external advisor was Advisor, which was formed as a Nevada limited liability company on March 23, 2012.  Advisor's principals included Defendant Shustek and (nonparty) John Alderfer.  MVP REIT I's advisory relationship with Advisor was terminated coincident with the MVP Merger.

30.     While externally managed, MVP REIT I operated under the direction of its board of directors, who were responsible for directing the management of MVP REIT I's business and affairs.  In total, MVP REIT I had five directors.

31.     MVP REIT I's initial directors included the following persons -- four out of five of whom are currently Directors of the Company:

| | |
|---|---|
| Frederick J. Zaffarese Leavitt | Director |
| Michael V. Shustek | Chief Executive Officer, Director |
| Robert J. Aalberts | Director |
| Nicholas Nilsen | Director |
| John E. Dawson | Director |

32.     MVP REIT I's initial executive officers and board members were all affiliated with Vestin Mortgage, LLC ("Vestin Mortgage") and its various funds and affiliates, including *inter alia*, VRM II, the 40% owner of MVP REIT I Advisor.

33.     In connection with its public offering, MVP REIT I sought to raise approximately $550 million in investor equity through the issuance of common stock priced at $9.00 per share. Further, the selling commission on the offering was set at 3.0% of gross offering proceeds. Additional fees were also outlined in MVP REIT I's Registration Statement, including but not limited to: (i) a 3% acquisition fee for the purchase of any real estate; (ii) a monthly asset management fee equal to 0.85% of the fair market value of all assets then held by MVP REIT I; and (iii) certain organizational and offering expenses.  All these fees and expenses were payable to MVP REIT I's external advisor, Advisor.

34.     MVP REIT I's Registration Statement was declared effective by the SEC on September 25, 2012.  Subsequently, by December 11, 2012, MVP REIT I had reached its minimum offering of $3 million.

35.     As of December 31, 2012, MVP REIT I had raised approximately $25.5 million through the sale of is its common stock, net of commissions.  By July 2013, MVP REIT I's board of directors had approved changes in its investment strategy to focus specifically on investments in self-storage facilities and parking facilities.

36.     In connection with offering shares to the public, MVP REIT I utilized broker-dealer MVP American Securities ("MVP AS"), formerly known as Ashton Garnett Securities, LLC.  MVP AS is an affiliate of Advisor and is owned by Shustek.

37.     By September 30, 2014, MVP REIT I had sold approximately $31.7 million of its common stock, net of commissions.  By this date, MVP REIT I had acquired seven properties with a total purchase price of approximately $20.4 million (exclusive of closing costs).

38.     MVP REIT I's offering closed in September 2015 after raising approximately $97.3 million in proceeds of the sales of its common stock.

**MVP REIT II – Overview**

39.     Headquartered in San Diego, California, MVP REIT II was formed as a Maryland entity on May 4, 2015.  MVP REIT II is an UPREIT, or an Umbrella Partnership Real Estate Investment Trust, meaning that the non-traded REIT was structured to conduct business through an operating partnership.  Specifically, MVP REIT II transacted business through MVP REIT II Operating Partnership, LP, a Delaware operating partnership organized on June 8, 2015.

40.     With a similar business focus as MVP REIT I, MVP REIT II was organized in order to focus primarily on parking facilities, including parking lots, parking garages, and other parking structures located throughout the United States and Canada.

41.     MVP REIT II was sponsored by MVP Capital Partners II, LLC ("MVPCP II"), a Nevada limited liability company.  Managed by Vestin Mortgage, MVPCP II was owned by VRM and VRM II, owners of 40% and 60% of the outstanding membership interests in the sponsor, respectively.

42.     Prior to the MVP Merger, and continuing post-merger and name change, MVP REIT II was externally managed by Advisor.  In similar fashion to MVP REIT I, MVP REIT II was an externally managed non-traded REIT that operated under the direction of its board of directors, who were responsible for directing the management of the REIT's business and affairs. Initially, MVP REIT II's Directors included the following persons:

| | |
|---|---|
| Michael V. Shustek | Chief Executive Officer, President, Chairman |
| David Chavez | Independent Director |
| John E. Dawson | Independent Director |
| Erik A. Hart | Independent Director |
| Allen Wolff | Independent Director |

Defendants Shustek and Dawson are currently Directors of the Company.  Defendant Wolff resigned as a Director of MVP REIT II on April 29, 2018.  Nonparty Erik A. Hart ("Mr. Hart") resigned on September 14, 2018.  Defendant Chavez served as a Director of the Company from 2015 until 2019.  He did not stand for reelection in 2019.

-12-

43. Through its public offering, MVP REIT II sought to raise up to $550 million in investor equity through the issuance of common stock priced at $25.00 per share. In connection with the offering, Advisor was paid a selling commission of up to 6.5% of gross offering proceeds. Furthermore, additional fees as outlined in MVP REIT II's Registration Statement included: (i) a 2.25% acquisition fee for the purchase of any real estate not acquired from an affiliate; (ii) a monthly asset management fee equal to 0.833% of the cost of assets at the end of each month; and (iii) certain organizational and offering expenses. As with MVP REIT I, all these expenses were payable to Advisor.

44. MVP REIT II's Registration Statement was declared effective by the SEC on October 22, 2015. Subsequently, by December 31, 2015, MVP REIT II had fulfilled its minimum offering requirement of $2 million in subscriptions and raised approximately $2.4 million in investor equity.

45. As of May 16, 2016, MVP REIT II had sold approximately 727,993 shares of common stock, thus raising net cash proceeds of approximately $18.2 million in the initial offering. As with MVP REIT I, MVP REIT II relied upon affiliated broker-dealer MVP AS to sell shares.

46. By September 30, 2016, MVP REIT II had raised approximately $44.9 million in proceeds in connection with its offering.

## Shustek Causes MVP REITs I and II to
## Violate FINRA Rules

47. In February 2018, the Company's Audit Committee began an investigation of whistleblower allegations made against Shustek by a former employee of Advisor, as well as an investigation as to whether Shustek provided false information to FINRA in connection with an

investigation that FINRA was conducting of him.  More specifically, the whistleblower reported to the Board that Shustek had provided false personal financial statements to one or more of the Company's lenders in connection with mortgage loans or guarantees where Shustek is a personal non-recourse carveout guarantor.

48.     These allegations were not Shustek's first run-ins with regulators.  In February 1999, the Nevada Financial Institutions Division ("NFID") entered an order seizing a mortgage company controlled by Shustek called Del Mar Mortgage, Inc. ("Del Mar").  The NFID alleged that Del Mar had engaged in misconduct including making misrepresentations and omissions of material fact to investors in Del Mar's holding company and failing to honor an agreement with NFID concerning procedures for custody of investor funds.

49.     On September 27, 2006, following an SEC investigation, the SEC entered an order against Shustek and two of this companies, the Vestin Manager and Vestin Capital, Inc. (a FINRA registered broker-dealer firm owned and controlled by Shustek) after determining that Shustek and others violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 by making false and misleading representations to prospective investors concerning the source of cash distributions to investors.  Without admitting the SEC charges, the respondents in the matter, including Shustek, consented to entry of a cease and desist order, and Shustek agreed to a $100,000 fine and a six-month suspension from the securities industry.

50.     The whistleblower's allegations reported to Parking REIT's Audit Committee in 2018 surrounding Shustek were two-fold in nature.  First, the allegations concerned "potentially inaccurate disclosures by [MVP AS], the broker-dealer affiliated with the Advisor, to [FINRA] relating to total underwriting compensation paid by the Advisor and its affiliates (other than Registrant) in connection with the initial public offerings of MVP REIT, Inc. and the Registrant."

-14-

51.     Second, the allegations raised in Parking REIT's Form 12b-25 disclosure concerned "potential inaccuracies in personal financial statements of Shustek that were provided to one or more of the Registrant's lenders in connection with mortgage loans or guarantees where Shustek is a personal non-recourse carve-out guarantor."

52.     FINRA's 2018 investigation of Shustek's activities also related to whether aggregate underwriting compensation paid by the Company and by MVP REIT I in their initial public offerings exceeded the applicable limits permitted by FINRA rules.  However, in February 2019, FINRA's Department of Enforcement staff determined that it would not recommend action against Shustek based on the underwriting compensation matter.

53.     Even though FINRA later chose not to commence action against Shustek, the Board's Audit Committee disclosed in April 2018 that it had found that Shustek had provided false information to the both the Company's lenders and to FINRA, including material inaccuracies in filings with FINRA in connection with MVP REIT I and MVP REIT II's offerings.  Furthermore, as disclosed in Parking REIT's Quarterly Report on Form 10-Q dated August 12, 2019, on June 5 and June 17, 2019, Shustek received two subpoenas from the SEC seeking production of "documents related to the Company and certain other entities and properties affiliated with Mr. Shustek, the Company, the Company's sponsor and the Company's former external manager."

54.     Subsequent to its Form 12b-25 disclosure, the Company filed an 8-K on May 3, 2018.  Through this 8-K filing, Parking REIT disclosed that as of April 27, 2018, the Board's Audit Committee had concluded its internal investigation into the whistleblower's allegations.  Specifically, through this 8-K, the Company first disclosed that, based upon the information made available to the Audit Committee: "Mr. Shustek did not exercise proper judgment and

appropriate oversight in connection with the initial submission of underwriting compensation information to FINRA and personal financial statements to the Company's lenders, which resulted in the submission of inaccurate information to FINRA and the Company's Lenders."

55.     In response to these issues, the Board's Audit Committee recommended to the full Board that the roles of Chairman and Chief Executive Officer (both occupied by Shustek) should be bifurcated as to limit Shustek's control over the Company.  The Board adopted the Audit Committee's recommendation that the Company's Chief Financial Officer report directly to the Board but declined to adopt its recommendation to bifurcate the Chairman and Chief Executive Officer roles.

56.     Shortly following the Company's May 3, 2018 8-K disclosure of certain corporate governance measures -- including the newly implemented requirement that the Chief Financial Officer report directly to the Board at least quarterly -- Parking REIT filed another 8-K on May 11, 2018.  Specifically, through its May 11, 2018 8-K filing with the SEC, the Company disclosed its intention to terminate then Chief Financial Officer Edwin Bentzen IV, insofar as the Company was declining to renew Mr. Bentzen's employment agreement, set to expire on June 13, 2018.

57.     On May 31, 2018, the Board approved the non-renewal of Mr. Bentzen's employment agreement in his capacity as Parking REIT Chief Financial Officer.  On the same day, the Board approved Mr. Brandon Welch as the interim Chief Financial Officer of Parking REIT.

58.     At the time of his appointment, Mr. Welch, age 35, had been employed with Advisor since the inception of MVP REIT I in 2012.  Further, Mr. Welch is the son-in-law of Shustek.

-16-

59.     The Board's Audit Committee that conducted the investigation of Shustek and issued findings critical of his conduct was comprised of three Directors, Defendants Chavez and Wolff, and Mr. Hart.

60.     One of these three Directors on the Audit Committee, Defendant Wolff, resigned shortly after the conclusion of the investigation.  Another of the Directors, nonparty Mr. Hart, was forced off the Board in August 2018 in a series of events that led to a "noisy resignation" (*see infra*) and the third, Defendant Chavez, did not stand for re-election to the Board in 2019. Thus, the three Directors who had dared to challenge Shustek's ultimate authority over Parking REIT and its Board were all off the Board within approximately one year's time.

61.     Issues concerning the violations of FINRA rules caused by Shustek were not disclosed to MVP REIT I and II shareholders in the proxy statements disseminated to seek approval of the MVP Merger, although they had occurred prior to the dissemination of the Proxy Statements, nor were the facts underlying Mr. Shustek's misstatements to company lenders concerning his personal financial statements disclosed.

**The MVP Merger**

62.     On December 31, 2016, MVP REIT II ceased all selling efforts for its initial public offering of shares of common stock at $25.00 per share.  The Company accepted additional subscriptions through March 31, 2017, the last day of the initial public offering, and raised a total approximately $61.3 million in the initial public offering before payment of deferred offering costs of approximately $1.1 million, contribution from an affiliate of Advisor of approximately $1.1 million and cash distributions of approximately $1.8 million.

63.     On May 1, 2017, MVP REITs I and II jointly announced that, following review of strategic alternatives, "a special committee of the board of directors of MVP I … has accepted

-17-

a non-binding Letter of Intent ("LOI") from MVP REIT II regarding a proposed merger of MVP I with MVP REIT II."

64.     On May 26, 2017, the Company announced a merger agreement for the merger of the REITs, MVP REIT I and MVP REIT II (the MVP Merger).

65.     In a joint press release, MVP REITs I and II announced that "after reviewing strategic alternatives, a special committee of the board of directors of MVP I (the 'MVP I Special Committee') has accepted a non-binding Letter of Intent ('LOI') from MVP II regarding a proposed merger of MVP I with MVP II."  The press release added that the merger consideration payable by MVP REIT II to each holder of common stock MVP REIT I would be 0.365 shares of the Company's common stock.

66.     In connection with the proposed merger, MVP REIT I also announced that it would suspend its distribution reinvestment plan and share repurchase plan pending the consummation of the proposed merger.  The MVP Merger was to be effectuated via MVP REIT I's merger with and into a wholly owned merger subsidiary of MVP REIT II.

67.     On December 15, 2017, the MVP Merger was consummated.  At the effective time of the MVP Merger, and pursuant to the terms of the merger agreement, each share of MVP REIT I common stock that was issued and outstanding immediately prior to the merger was converted into the right to receive 0.365 shares of Company common stock.  The Company was renamed "The Parking REIT, Inc." following the merger.

68.     A total of approximately 3.9 million shares of Company common stock were issued to former MVP REIT I stockholders.  Former MVP REIT I stockholders, immediately following the merger, owned approximately 59.7% of the Company's common stock.

## The Company Terminates Its Private Offering and
## Suspends Distributions

69.    On April 7, 2017, the Company commenced a Regulation D 506(b) private placement of shares of Series 1 Convertible Redeemable Preferred Stock, together with warrants to acquire the Company's common stock, to accredited investors.  On January 31, 2018 the Company closed this offering.  On February 7, 2018, the Company filed a Form 8-K with the SEC, disclosing that as of February 6, 2018, Parking REIT had "completed its private placement of the Company's Series 1 Convertible Redeemable Preferred Stock ('Series 1 Stock') and corresponding warrants to purchase 35 shares of the Company's common stock for every $1,000 of Series 1 Stock subscribed (the 'Warrants')."

70.    Thus, as of the close of Parking REIT's private offering of stock in early February 2018 -- conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, and Regulation D ("Reg D") promulgated thereunder -- "the Company sold a total of approximately 39,810 shares of its Series 1 stock, along with the corresponding Warrants representing in aggregate the right to purchase 1,382,605 shares of the Company's common stock, to accredited investors for total gross proceeds of approximately $39,810,928."

71.    In connection with Parking REIT's private offering to accredited investors pursuant to Reg D, the Company paid, in aggregate, approximately $2,299,000 in selling commissions, approximately $709,000 in managing broker dealer fees, and approximately $466,000 in expense reimbursements related to due diligence on the private offering.

72.    Subsequent to the termination of its private offering, on March 23, 2018, the Company issued a press release announcing the suspension of cash distributions and stock dividends to holders of Parking REIT's common stock, effective immediately.

-19-

**The Third Amended and Restated Advisory Agreement (TARAA) and
the Proposed Nasdaq Listing**

73.     In connection with the MVP Merger and otherwise, Shustek caused Parking REIT (whose companywide NAV was only $161.2 million as of May 2018) to pay Advisor $6.8 million in fees in 2017, including asset management fees of $1.2 million, acquisition fees of $1.96 million, and merger fees of $3.6 million.  The $3.6 million was a so-called "merger fee" payable as a result of the completion of the MVP Merger.

74.     Under the Second Amended and Restated Advisory Agreement ("SARAA"), which became effective upon completion of the MVP Merger and remained effective until the Internalization on April 1, 2019, Advisor received 1.1% of the Company's asset value per year as a management fee, capped at $2 million per year unless Parking REIT reached an aggregate asset value of $500 million.  Like the initial agreement between MVP REIT II and Advisor, the terms of the SARAA provided for the Board's ability to terminate Advisor without cause or penalty on 60 days' written notice.

75.     Under the guise of permitting the Company to engage in an internalization of the advisory function after a public listing of the Parking REIT's shares, on September 21, 2018 Shustek then induced the Company to enter into a new advisory agreement -- the TARAA -- with the Advisor which contained multiple terms far less advantageous to the Company than the SARAA that it was intended to replace.  The TARAA was negotiated by a special committee of the Board including three members, two of whom are former board members of VRM II.  The TARAA would have become effective upon completing of the Company's listing on Nasdaq.

76.     The TARAA provided for a termination fee of up to $21 million payable to Advisor if the Company engaged in a change-of-control transaction or internalized its advisory

function.  The SARAA, by contrast, called for no termination fee.  This outrageous windfall for Advisor was justified by Defendants as follows:

> In recognition of the upfront effort required by the Advisor to structure and acquire our assets and the Advisor's commitment of monies and resources to our business and operations for which the Advisor would be entitled to but, has not received, reimbursement from us, and as consideration for the Advisor's release and performance of its other obligations upon termination of the amended advisory agreement, we will pay the Advisor a termination fee…

77.     This disingenuous and underhanded rationale for the Board's decision ignores the fact that the Company was contractually entitled to terminate the SARAA without cause or penalty, rendering the termination fee essentially a self-imposed gratuity to Shustek and his affiliates.  Further, Advisor was already contractually bound to cooperate with the Company in the event of termination.  As set forth in ¶ 8(b) of the SARAA:

> (b) The Advisor shall promptly upon termination:

>> (i) pay over to the Company and the Operating Partnership all money collected and held for the account of the Company and the Operating Partnership pursuant to this Agreement, after deducting any accrued compensation and reimbursement for its expenses to which it is then entitled;

>> (ii) deliver to the Board a full accounting, including a statement showing all payments collected by it and a statement of all money held by it, covering the period following the date of the last accounting furnished to the Board;

>> (iii) deliver to the Board all assets, including all investments, and documents of the Company and the Operating Partnership then in the custody of the Advisor; and

>> (iv) cooperate with the Company and the Operating Partnership to provide an orderly management transition.

78.     At least one (now former) Parking REIT Director appears to have objected to the TARAA.  On September 14, 2018, former Director and relevant non-party Mr. Hart resigned shortly before the TARAA was publicly announced, stating in a letter to the Board that he was

resigning in part "because, on September 12 [2018], the Board passed a significant amendment… to the advisory agreement… ."  Mr. Hart went on to express concerns that under the TARAA "instead of being able to terminate the advisor… and our CEO, Mike Shustek, with sixty days' notice with no automatic costs to shareholders, the Board has now agreed to an internalization or termination fee of between sixteen and twenty-one million dollars payable to the Advisor."

79.     Mr. Hart also complained about his exclusion from a Board meeting at which the TARAA was to be considered and indicated that other Board members on the Nominating Committee had decided not to allow him to stand for re-election to the Board because of "the lack of control the CEO, Michael Shustek, and the Chairman of the Board had over my participation in board meetings."

80.     On October 9, 2018, Parking REIT announced that it had applied to list its common stock on the Nasdaq Global Market under the symbol "PARK."  August 29, 2019, the Company withdrew its application to list shares on Nasdaq in a letter to the SEC.

**Shustek's Secret Plan to Internalize Parking REIT's Advisory Function Comes to Fruition, Leading to A Financial Windfall for Advisor and Shustek**

81.     Less than six months after Parking REIT had announced its application to list its shares, investors were caught by surprise when the Company announced (as a *fait accompli*) the internalization of its advisory function without completion of a Nasdaq listing.

82.     On March 29, 2019, the Company and the Advisor entered into definitive agreements to internalize the Company's management function effective April 1, 2019 (the "Internalization Agreements").  Advisor had managed the operations of both the Company and MVP I since their respective formations and continued to manage Parking REIT after the merger closed in December 2017.

83.     As part of the Internalization Agreements, among other things, the Company agreed with the Advisor to: (i) acquire and assume substantially all of the Advisor's assets and liabilities; (ii) terminate the SARAA, dated as of May 26, 2017 and, for the avoidance of doubt, the TARAA, dated as of September 21, 2018, which by its terms would have become effective only upon a listing of the Company's common stock on a national securities exchange; (iii) extend employment to the executives and other employees of the Advisor; (iv) arrange for the Advisor to continue to provide certain services with respect to outstanding indebtedness of the Company and its subsidiaries; and (v) lease the employees of the Advisor for a limited period of time prior to the time that such employees become employed by the Company.

84.     As part of those same agreements, the Company agreed to issue to the Advisor over a period of more than two and a half years 1.6 million shares of the Company's common stock as consideration under the terms of the Internalization Agreement.  The consideration is issuable in four equal installments.  The first installment of 400,000 shares of common stock was issued on the Effective Date.  The remaining installments will be issued on December 31, 2019, 2020, and 2021 (or if December 31st is not a business day, the last business day of such year).  The Internalization Agreements became effective as of April 1, 2019.

85.     The issuance of the 1.6 million shares of Company stock payable to Advisor pursuant to the Internalization had a substantial dilutive effect on other Parking REIT stockholders, and unjustly enriched Advisor and Shustek at expense of its public investors.  At the Company's estimated NAV per share of $25.10 as of May 15, 2019, these shares would be worth $40,160,000, while Parking REIT's reported companywide NAV is only $174,094,000 as of May 28, 2019.   The cost of issuing the 1.6 million shares of Parking REIT stock to Advisor pursuant to the Internalization is somewhat mitigated by the Company's right to repurchase up

to 1.1 million shares from Advisor for $17.50 a share.  However, even taking this into account, the total value of the stock consideration payable to Advisor under the Internalization would be at least $31,800,000 based on the Company's estimated NAV of $25.10 a share.

86.     Pursuant to the operating agreement of the Advisor ("Advisor Operating Agreement"), VRM I and VRM II are responsible for the Advisor's expenses in proportion to their respective ownership interests in the Advisor.  Further, pursuant to the Advisor Operating Agreement, Shustek is entitled to 40% of the Advisor's net profits after VRM I and VRM II have been repaid for any capital contribution made to the Advisor and after they have received a 7.5% annualized return on their capital investments in the Advisor.

87.     VRM I's and VRM II's SEC filings describe Shustek's purported entitlement to 40% of the Advisor's profits as a "recognition of [MVP Capital's] substantial investment in [the Advisor] for which [MVP Capital] received no up-front consideration."  VRM I's and VRM II's SEC filings further disclosed that: (i) MVP Capital had contributed $1,500 to Advisor for its 60% ownership interest; (ii) as of June 30, 2013, MVP Capital had loaned Advisor $1.2 million; and (iii) MVP Capital decided to forgive the $1.2 million loan on June 30, 2013.

88.     Following the trail further, Shustek is intimately involved in and effectively controls VRM I and VRM II.  Shustek is a Director, as well as Chief Executive Officer (and sole Executive Officer) of both VRM I and VRM II.  VRM I and VRM II were formerly managed by Vestin Manager - an entity also controlled by Shustek, and in which Shustek holds a majority ownership interest-- until January 2018, when Vestin Manager was internalized.

89.     Shustek also has a substantial ownership interest in VRM I and VRM II.  As of May 7, 2019, Shustek beneficially owned 18.25% of VRM I and 33.56% of VRM II.

-24-

90.     But the plot thickens further.  VRM I and VRM II were *owed* very substantial sums by Advisor - debts that Shustek and his compliant Board caused Parking REIT to assume in connection with the Internalization.

91.     As of September 2016, VRM II had loaned approximately $12.9 million to Advisor.  At relevant times VRM II had written down these loans' value but had not forgiven them.  VRM I had also loaned approximately $4.5 million to Advisor of September 2016.

92.     Thus, Advisor owed approximately $17.4 million in total to VRM I and VRM II. Since these debts were not listed as retained liabilities, the Company therefore apparently assumed these debts on April 1, 2019 pursuant to the Internalization Agreement when it internalized Advisor (along with all of Advisor's other liabilities and purported assets).

93.     The only "transferred assets" of Advisor that the Internalization Agreement references are Advisor's contracts, and the only contract that generated meaningful revenue for the Advisor was the SARAA, which was terminated effective upon the consummation of the Contribution Agreement.  Further, the value of the SARAA was questionable, since it was by its terms terminable without cause upon 60 days' notice.

94.     Hence, the Internalization Agreements caused Parking REIT pay substantial value and to assume substantial liabilities, while gaining assets with negligible value.

95.     But even without accounting for the substantial liabilities that the Company assumed in connection with the Internalization Agreements or the dilutive effect to existing shareholders of Parking REIT's issuance of 1.6 million shares of common stock to Advisor, the Company would still likely be worse off financially as a self-managed REIT.  The Company's Employment Agreements indicate that the Company may pay in excess of $2 million in annual compensation to its officers effective April 2019.  Thus, the executive compensation for Parking

REIT's new employees alone likely will exceed the $2 million cap on advisory fees that had been in place under the SARAA.

96.     The Company's Employment Agreements signed in connection with the Internalization Agreements specify that the Company shall pay the following compensation to Shustek as well as the other new Executive Officers of Parking REIT, Dan Huberty and J. Kevin Bland:

- Annual base compensation of $550,000, $300,000, and $250,000 to Shustek, Huberty, and Bland respectively;

- Annual target incentive compensation of not more than $250,000, $153,000, and $50,000 to Shustek, Huberty, and Bland respectively; and

- Annual target equity awards of not more than $1 million, $153,000, and $130,000 in restricted shares of Company common stock to Shustek, Huberty, and Bland respectively.

97.     Each of the Company's Employment Agreements also specifies that the Company shall pay substantial severance compensation upon the Executive Officer's termination except upon the Executive Officer's termination with cause or upon the Executive Officer's resignation without good reason.

98.     In addition to paying new salaries that exceed its old management fees, Parking REIT will now have to pay expenses such as rent and utilities to operate Advisor's offices-expenses formerly borne by Advisor and effectively included in the $2 million annual management fees.

99.     As justification for issuing 1.6 million shares of Company stock to Advisor, the Defendants contended that the Advisor "has incurred unreimbursed expenses on behalf of MVP REIT and the Company in an aggregate amount exceeding $25 million." However, the Company's own earlier SEC filings showed that the Advisor had been reimbursed for all

expenses to which it was entitled to reimbursement.  The Company reported in its Form 10-Q on May 14, 2019 that "as of March 31, 2019, the Advisor was due approximately $0.6 million in reimbursable expenses, the balance of which has been paid as of the date of this filing."

100.    Thus, just as Defendants rewarded Advisor with $3.4 million in merger fees for terminating management contracts that the respective boards of MVP I and Parking REIT had the unilateral right to terminate without cause on 60 days' notice, the Company purported to reimburse expenses for which Advisor apparently had no right to reimbursement.  Once again, this gratuity was at the expense of Parking REIT's public shareholders and to the financial benefit of Shustek.

### The False and Misleading Proxy Statements

*August 2017 Proxies*

101.    The MVP Merger was effectuated via separate false and misleading proxy statements disseminated to shareholders of MVP REITs I and II, respectively on or about August 21, 2017 (defined above as the "August 2017 Proxies").  The August 2017 Proxies were necessary to achieve stockholder approval for the MVP Merger and certain charter amendments, which in turn were required in order to accomplish Defendants' scheme to transfer wealth to Shustek and his affiliates through the MVP Merger and the Internalization.  Without the August 2017 Proxies, the MVP Merger and the Internalization could not have been accomplished. As such, the August 2017 Proxies were each an essential link in the accomplishment of the MVP Merger and the Internalization.

102.    The proxy statement on Schedule 14A disseminated to MVP REIT II shareholders ("MVP II Proxy Statement") describes the purposes of the MVP Merger and related charter amendments as follows:

The proposed amendments to our charter are primarily intended to accomplish two objectives in connection with the possible listing of our common stock: (1) to remove provisions of our charter that we believe may unnecessarily restrict our ability to take advantage of further opportunities for liquidity events or are redundant with or otherwise addressed or permitted to be addressed under Maryland law and (2) to amend certain provisions in a manner that we believe would be more suitable for becoming a publicly-traded REIT. The majority of the changes to our charter that we are proposing relate to the removal or revision of provisions and restrictions that were required by state securities administrators in order for us to publicly offer shares of our stock without having it listed on a national securities exchange. If our common stock is listed on a national securities exchange, these provisions and restrictions will no longer be required and, in some cases, if retained, would place restrictions on our activities that could put us at a competitive disadvantage compared to our peers with publicly listed securities.

103.   This statement in the MVP II Proxy Statement was materially misleading at the time that it was made because it failed to disclose that the actual primary reasons that Defendants were seeking to implement the MVP Merger and certain charter amendments were: (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

104.   In fact, the charter amendments approved pursuant to the MVP II Proxy Statement were expressly designed to pave the way for the Company's entry into the Third Amended and Restated Advisory Agreement ("TARAA") - the terms of which were expressly prohibited by MVP REIT II's original charter.  The original charter provided as follows: "Section 8.5 Termination. A majority of the Independent Directors may terminate the Advisory Agreement on 60 days' written notice without cause or penalty, and, in such event, the Advisor

will cooperate with the Corporation and the Operating Partnership in making an orderly transition of the advisory function."

105.    Further, Article VIII of the original charter provided that Advisor acts as a fiduciary to the Company and provided detailed guidance for the Board of Directors to supervise Advisor's performance and compensation.

106.    The charter amendments approved via the MVP II Proxy Statement gut these protections - eliminating any requirement that the Advisor may be terminated "without cause or penalty" and, indeed, deleting Article VIII of the original charter in its entirety.   The only substantive mention of the Advisor in the Company's charter as amended essentially gives the Board carte blanche authority to enter into any advisory arrangement it wishes.   The relevant language is as follows:

> Section 7.8 Advisor Agreements. Subject to such approval of Stockholders and other conditions, if any, as may be required by any applicable statute, rule or regulation, the Board of Directors may authorize the execution and performance by the Corporation of one or more agreements with any person, corporation, association, company, trust, partnership (limited or general) or other organization whereby, subject to the supervision and control of the Board of Directors, any such other person, corporation, association, company, trust, partnership (limited or general) or other organization shall render or make available to the Corporation managerial, investment, advisory and/or related services, office space and other services and facilities (including, if deemed advisable by the Board of Directors, the management or supervision of the investments of the Corporation) upon such terms and conditions as may be provided in such agreement or agreements (including, if deemed fair and equitable by the Board of Directors, the compensation payable thereunder by the Corporation).

107.    Thus, far from being ministerial or housekeeping amendments to the charter to prepare the Company for a public listing, in fact the amendments were consciously intended to give the Board the unfettered discretion to enter into the onerous TARAA and gift Advisor a materially more advantageous agreement with the Company in exchange for no real

consideration. Defendants deliberately concealed the true purpose of the charter amendments in the MVP II Proxy Statement in order to obtain shareholder approval under false pretenses.

108. MVP REIT I filed a Proxy Statement/Prospectus with the SEC on August 16, 2017 ("MVP I Proxy Statement") that contains language identical to that set forth in ¶ 106, *supra*, concerning Advisor Agreements and also concealed the true purpose of the charter amendments to MVP REIT II's charter. This statement in the MVP I Proxy Statement was materially misleading at the time that it was made for the same reason as the identical statement in the MVP II Proxy Statement: because it failed to disclose that the actual primary reasons that Defendants were seeking to implement the MVP Merger and certain charter amendments were: (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

109. The August 2017 Proxies stated as follows concerning Mr. Shustek's role at Parking REIT:

Board Leadership Structure

Our Board of Directors has determined that its current structure, with combined Chairman and CEO roles, is in the best interests of the Company. The Board believes that combining the Chairman and CEO roles is the appropriate corporate governance structure and works well for the Company because it most effectively utilizes Mr. Shustek's extensive experience and knowledge regarding the Company, the Company's business and markets, and the Company's competitors, and provides for the most effective leadership of our Board and Company.

-30-

110.    The statement quoted in Paragraph 109 was rendered false and misleading as a result of Defendants' failure to disclose that Shustek had caused MVP REITs I and II to violate FINRA rules and made misstatements of fact to lenders (as alleged in detail at ¶¶ 47-61 *supra*).

111.    The August 2017 Proxies stated as follows concerning the termination with respect to Advisor's compensation in connection with the MVP Merger:

> Concurrently with the entry into the merger agreement, MVP I, MVP II, MVP REIT II Operating Partnership, LP, or "MVP II OP," and the Advisor entered into a Termination and Fee Agreement, or the "termination and fee agreement." Pursuant to the termination and fee agreement, at the effective time of the merger, the existing advisory agreement between MVP I and the Advisor will be terminated, and the Advisor will waive all fees payable to the Advisor as a result of such termination. However, upon consummation of the merger, the Advisor will be entitled to receive an advisor acquisition payment, which is referred to as the "advisor acquisition payment", from MVP II, as contemplated by the termination and fee agreement and the Amended and Restated Advisory Agreement among MVP II, MVP II OP and the Advisor, which is referred to as the "existing MVP II Advisory Agreement." As a result, on the closing date of the merger, MVP II will pay the Advisor the advisor acquisition payment of approximately $3.6 million in cash, subject to adjustment to the extent that MVP I acquires additional properties prior to closing of the merger.

112.    The statement quoted in Paragraph 111, above, was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Parking REIT was not under any binding obligation to agree to pay the $3.6 million merger fee, which amounted to a gratuity paid at the expense of Parking REIT and to the financial benefit of Advisor and, indirectly, Shustek.

113.    The August 2017 Proxies stated as follows with respect to conflicts of interest in connection with related party transactions:

> In order to reduce or eliminate and address certain potential conflicts of interest, our charter requires that a majority of our board of directors (including a majority of the independent directors) not otherwise interested in the transaction approve any transaction with any of our directors, our Sponsor, the Advisor, or any of their affiliates. The independent directors will also be responsible for reviewing from

time to time but at least annually (1) the performance of the Advisor and determining that the compensation to be paid to the Advisor is reasonable in relation to the nature and quality of services performed; (2) that our total fees and expenses are otherwise reasonable in light of our investment performance, our net assets, our net income, the fees and expenses of other comparable unaffiliated REITs and other factors deemed relevant by our independent directors; and (3) that the provisions of the advisory agreement are being carried out. Each such determination shall be reflected in the applicable board minutes

114.    The statement quoted in Paragraph 113 above was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that: (i) Parking REIT had agreed to pay the $3.6 million merger fee to Advisor, despite the fact that it was not under any binding obligation to agree to pay the merger fee; and (ii) that the true purpose of the MVP Merger was to facilitate an internalization transaction for the financial benefit of Advisor and Shustek (whether or not accompanied by the listing of the Company's stock on an exchange).

115.    The August 2017 Proxies stated as follows with respect to VRM I and VRM II's relationships to Advisor and arrangements with respect to expenses:

VRM I and VRM II own 40% and 60%, respectively, of the Advisor. Neither VRM I nor VRM II paid any up-front consideration for these ownership interests, but each will be responsible for its proportionate share of future expenses of the Advisor.  The operating agreement of the Advisor provides that once VRM I and VRM II have been repaid in full for any capital contributions to the Advisor or for any expenses advanced on the Advisor's behalf, or capital investment, and once they have received an annualized return on their capital investment of 7.5%, then Michael Shustek will receive 40% of the net profits of the Advisor.

116.    The statement quoted in Paragraph 115 above was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Advisor owed $17.4 million to VRM I and VRM II (which liabilities Shustek would later cause the Company to assume in connection with the Internalization).

*August 2018 Proxy*

117.    After the completion of the MVP Merger, at Shustek's behest the Company then set about pursuing the accomplishment of the Internalization.  On February 1, 2018, the Board appointed a Special Committee (the "February 2018 Special Committee") to consider this issue, with Defendant Wolff as chair, and with Directors Mr. Hart and Defendant Chavez as committee members.

118.    The purpose of the February 2018 Special Committee was to review the Company's potential internalization of the Advisor and to negotiate for it.  But on April 23, 2018 - amidst these same three directors' review of whistleblower and FINRA allegations against Shustek - the Board disbanded this Special Committee.  Prior to being disbanded on April 23, 2018, the February 2018 Special Committee held two meetings.

119.    On May 31, 2018 the Board again appointed a new Special Committee for the same stated purpose of negotiating an internalization transaction, naming Defendant Dawson as chair, with Defendants Nilsen and Aalberts as committee members.

120.    Yet, on November 7, 2018 the Board disbanded the May 2018 Special Committee, at which time it was decided that all future negotiations regarding a potential internalization would be the responsibility of the Company's entire Board (other than Shustek). The May 2018 Special Committee held ten meetings prior to its termination.

121.    Against this backdrop, on August 20, 2018, the Company issued a proxy statement (defined above as the "August 2018 Proxy") soliciting proxies for the election of Defendants Shustek, Aalberts, Chavez, Dawson, Nelson, Nilsen and Wells as Directors.

122.    Although Shustek's secret plan to internalize Advisor, enrich himself via issuance of Parking REIT stock to Advisor, saddle the Company with Advisor's $17.4 million in debts,

and lock in a lucrative employment contract for himself was well underway, the August 2018 proxy did not disclose this secret plan. Indeed, it failed to mention the planned Internalization at all. This omission rendered various statements of fact contained in the August 2018 Proxy (including those quoted below) materially misleading because the omission concealed the fact that Shustek and his affiliates were pursuing a scheme to enrich themselves through an undisclosed Internalization plan,

123.    The August 2018 Proxy stated as follows with respect to Advisor's compensation in connection with the MVP Merger:

> Concurrently with the entry into the Merger Agreement, on May 26, 2017, the Company, MVP I, the Advisor and the Operating Partnership entered into a termination and fee agreement (the "Termination Agreement"). Pursuant to the Termination Agreement, at the effective time of the Merger, the Advisory Agreement, dated September 25, 2012, as amended, among MVP I and the Advisor was terminated, and the Company paid the Advisor an Advisor Acquisition Payment (as such term is defined in the Termination Agreement) of approximately $3.6 million, which was the only fee payable to the Advisor in connection with the Merger.

124.    The statement quoted in Paragraph 123, above, was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Parking REIT was not under any binding obligation to agree to pay the $3.6 million merger fee, which amounted to a gratuity paid at the expense of Parking REIT and to the financial benefit of Advisor and, indirectly, Shustek.

125.    The August 2018 Proxy stated as follows with respect to Advisor's reimbursable expenses:

> The Advisor has the option to request reimbursement of certain payroll expenses for salaries and benefits paid to non-executive officers. As of December 31, 2017, the Advisor was due approximately $162,000 in reimbursable expenses, which was paid as of the date of this filing.

126.    The statement quoted in Paragraph 125, above, was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Advisor purportedly "has incurred unreimbursed expenses on behalf of MVP REIT and the Company in an aggregate amount exceeding $25 million" that Defendants would cite as justification for the Company issuing 1.6 million shares of Parking REIT stock to advisor in connection with the Internalization.

127.    The August 2018 Proxy stated as follows with respect to conflicts of interest in connection with related party transactions:

> In order to reduce or eliminate and address certain potential conflicts of interest, our charter requires that a majority of our Board of Directors (including a majority of the independent directors) not otherwise interested in the transaction approve any transaction with any of our directors, our Sponsor, the Advisor, or any of their affiliates and determine that such transaction is fair and reasonable to the Company and on terms no less favorable to the Company than those available from unaffiliated third parties. The independent directors will also be responsible for reviewing from time to time but at least annually (1) the performance of the Advisor and determining that the compensation to be paid to the Advisor is reasonable in relation to the nature and quality of services performed and that such compensation is within the limits set forth in our charter; (2) that our total fees and expenses are otherwise reasonable in light of our investment performance, our net assets, our net income, the fees and expenses of other comparable unaffiliated REITs and other factors deemed relevant by our independent directors; and (3) that the provisions of the advisory agreement are being carried out.

128.    The statement quoted in Paragraph 127 above was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that: (i) Parking REIT had agreed to pay the $3.6 million merger fee to Advisor, despite the fact that it was not under any binding obligation to agree to pay the merger fee; and (ii) that the true purpose of the MVP Merger was to facilitate an internalization transaction for the financial benefit of Advisor and Shustek (whether or not accompanied by the listing of the Company's stock on an exchange).

129.    The August 2018 Proxy stated as follows with respect to the MVP Merger:

The transactions described below were approved by a majority of the Company's Board of Directors (including a majority of the independent directors) not otherwise interested in such transaction as fair and reasonable to the Company and on terms and conditions no less favorable to the Company than those available from unaffiliated third parties.

***The Merger***

On May 26, 2017, the Company, MVP I, Merger Sub, and the Advisor entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which MVP I would merge with and into Merger Sub (the "Merger"). On December 15, 2017, the Merger was consummated.

* * *

Concurrently with the entry into the Merger Agreement, on May 26, 2017, the Company, MVP I, the Advisor and the Operating Partnership entered into a termination and fee agreement (the "Termination Agreement"). Pursuant to the Termination Agreement, at the effective time of the Merger, the Advisory Agreement, dated September 25, 2012, as amended, among MVP I and the Advisor was terminated, and the Company paid the Advisor an Advisor Acquisition Payment (as such term is defined in the Termination Agreement) of approximately $3.6 million, which was the only fee payable to the Advisor in connection with the Merger.

130.    The statement quoted in Paragraph 129 above was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Parking REIT was not under any binding obligation to agree to pay the $3.6 million merger fee, which amounted to a gratuity paid at the expense of Parking REIT and to the financial benefit of Advisor and, indirectly, Shustek.

131.    The August 2018 Proxy stated as follows with respect to VRM I and VRM II's relationships to Advisor and arrangements with respect to expenses:

VRM I and VRM II own 40% and 60%, respectively, of the Advisor. Neither VRM I nor VRM II paid any up-front consideration for these ownership interests, but each agreed to be responsible for its proportionate share of future expenses of the Advisor. The operating agreement of the Advisor provides that once VRM I and

VRM II have been repaid in full for any capital contributions to the Advisor or for any expenses advanced on the Advisor's behalf, or capital investment, and once they have received an annualized return on their capital investment of 7.5% then Michael Shustek will receive 40% of the net profits of the Advisor.

132.     The statement quoted in Paragraph 131 above was rendered materially false and misleading at the time that it was made by Defendants' failure to disclose that Advisor owed $17.4 million to VRM I and VRM II (which liabilities Shustek would later cause the Company to assume in connection with the Internalization).

## LOSS CAUSATION

133.     Plaintiff and the Class have been directly financially harmed as a consequence of the violations of the federal securities laws set forth herein.  Specifically, the value of their shares have been materially impaired by Defendants' actions, which have diluted their interests in Parking REIT and caused Parking REIT's stock price to lose value.

134.     Under the terms of the Internalization, the Company agreed to issue to the Advisor over a period of more than two and a half years 1.6 million shares of the Company's common stock.  These 1.6 million shares of stock are ostensibly worth $40,160,000 based on the Company's reported NAV per share of $25.10 as of May 15, 2019.

135.     The issuance of the shares would cause substantial dilution to existing shareholders, as Parking REIT's reported companywide NAV is only $174,094,000 as of May 28, 2019.

136.     The cost of issuing the 1.6 million shares of Parking REIT stock to Advisor pursuant to the Internalization is somewhat mitigated by the Company's right to repurchase up to 1.1 million shares from Advisor for $17.50 a share.

137.    However, even into account the Company's right to repurchase shares for $17.50, the total value of the stock consideration payable to Advisor under the Internalization would be at least $31,800,000 based on the Company's reported estimated NAV of $25.10 a share.

138.    Based on the foregoing, if the 1.6 million shares are issued and Parking REIT maintains its current NAV per share, existing shareholders would suffer a dilution in the value of their shares of over 13%.

139.    Plaintiff and the Class have also been injured in their property by Defendants' acquiescence in Parking REIT's assumption of  $17 million in debt accumulated by Advisor, and owed to Shustek-controlled entities, in connection with the Internalization and in exchange for assuming assets of negligible value, as well as payment of the $3.6 million merger fee that the Company was not under any legal obligation to pay.

## CLASS ACTION ALLEGATIONS

140.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action consists of all public shareholders of the Company and MVP REIT I between August 11, 2017 and April 1, 2019 (the "Class Period").

141.    Thousands of persons are believed to be members of the putative class ("Class"), and those persons or entities are geographically dispersed.  Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

142.    Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).  Common issues of law and fact include but are not limited to:

(i)      whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

    (ii)      whether the Defendants breached fiduciary duties to Plaintiff and the Class;

    (iii)    whether the August 2017 Proxies and the August 2018 Proxy were false and misleading; and

    (iv)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

143.    Plaintiff's interests are typical of, and not antagonistic to, the interests of the Class.

144.    Plaintiff has retained competent counsel experienced with class actions and complex litigation and intends to vigorously prosecute this action.

145.    Common issues predominate. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Indeed, a class action is the only method by which Plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

146.    The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged unlawful conduct. Plaintiff does not anticipate any difficulties in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

### (Claim for Violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9)

147.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

148.    Defendants disseminated the false and misleading August 2017 Proxies and August 2018 Proxy[2], which contained statements that were false and misleading and, in light of the circumstances under which they were made, omitted to state material facts necessary to make

---

[2] Defendant William Wells only served on the Board at the time of issuance the August 2018 Proxy. Defendant Wolff only served on the Board at the time of issuance of the August 2017 Proxies.

the statements therein not materially false or misleading, in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9.

149.    The August 2017 Proxy Statements and August 2018 Proxy Statement were prepared, reviewed, and/or disseminated by Defendants.  By virtue of their positions, the Director Defendants were aware of the omitted information and their duty to disclose this information in the August 2017 Proxies and the August 2018.

150.    The Director Defendants were at least negligent in filing and disseminating the August 2017 Proxies and August 2018 Proxy containing the misstatements and omissions of material fact set forth herein.  Indeed, there are strong indicia that such misstatements and omissions were made with actual knowledge and intent to conceal the truth from Plaintiff and the Class.

151.    The omissions and misleading statements in the August 2017 Proxies and the August 2018 Proxy are material in that a reasonable shareholder would have considered them important in considering whether to vote to approve the MVP Merger and related charter amendments, and in deciding whether to vote in favor of election of the Company's Board nominees in August 2018.

152.    In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the August 2017 Proxies and August 2018 Proxy and in light of other information reasonably available to shareholders.

153.    The August 2017 Proxies and the August 2018 Proxy were essential links in accomplishing the MVP Merger, gaining shareholder approval of related charter amendments and effectuating the Internalization.  The August 2017 Proxies were necessary to achieve stockholder approval for the MVP Merger and certain charter amendments, which in turn were

required in order to accomplish Defendants' scheme to transfer wealth to Shustek and his affiliates through the MVP Merger and the Internalization. Without the August 2017 Proxies, the MVP Merger and the Internalization could not have been accomplished. As such, the August 2017 Proxies were each an essential link in the accomplishment of the MVP Merger and the Internalization.

154.   By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9.

155.   Plaintiff and the Class were damaged by Defendants violations of Section 14(a) of the 1934 Act and Rule 14a-9.  The false statements and omissions as set forth above proximately caused foreseeable financial losses and damages to Plaintiff and members of the Class.

156.   Defendants' misstatements and omissions of fact were essential links in accomplishing the Internalization, which has damaged Plaintiff and the Class by diluting the value of their ownership interest in Parking REIT and causing the Company to unjustifiably assume the liabilities of Advisor, thereby depressing the value of the Company's stock and harming the Company's stockholders – including Plaintiff and the Class.

## SECOND CLAIM FOR RELIEF

### (Claim for Violation of Section 20(a) of the 1934 Act Against the Director Defendants)

157.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

158.   The Director Defendants acted as controlling persons of Parking REIT and MVP REIT I within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as Officers and/or Directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the

August 2017 Proxies and the August 2018 Proxy, filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

159.   Each of the Director Defendants[3] was provided with or had unlimited access to copies of the August 2017 Proxies and the August 2018 Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

160.   In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of MVP REIT I, MVP REIT II, and/or the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The August 2017 Proxies and the August 2018 Proxy contain the unanimous recommendation of the Director Defendants to approve the MVP Merger and elect the Board members nominated by the Company.

161.   By virtue of the foregoing, the Director Defendants violated Section 20(a) of the 1934 Act.

162.   As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act

---

[3] Defendant William Wells only served on the Board at the time of issuance the August 2018 Proxy. Defendant Wolff only served on the Board at the time of issuance of the August 2017 Proxies.

-42-

and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.

163.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have been damaged as set forth above.

## THIRD CLAIM FOR RELIEF

### (Claim for Breach of Fiduciary Duty Against the Director Defendants)

164.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

165.    The Director Defendants owed and owe Plaintiff and the Class fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe Plaintiff and the Class the highest obligations of good faith, fair dealing, loyalty and due care, as well as a duty to disclose material facts in connection with requested shareholder action.

166.    By virtue of their conduct and omissions alleged herein, Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, disclosure, good faith and supervision.

167.    Each of the Director Defendants had actual or constructive knowledge that the two true major reasons for the MVP Merger and certain charter amendments were: (i) to pave the way for an amended advisory agreement designed to benefit Shustek financially in the event of an internalization of Parking REIT's advisory function or a change of control transaction; and (ii) to give Shustek the unfettered ability to cause Parking REIT to internalize its advisory function or otherwise terminate Advisor's contract with Parking REIT and thereby trigger an enormous termination fee of up to $21 million for Advisor.

168.     Further, each of the Director Defendants acquiesced in steps that were an essential link in accomplishing the Internalization, which had the effect of enriching Shustek at the expense of Parking REIT's public shareholders.

169.     However, despite this knowledge, the Director Defendants caused or permitted the MVP Merger and the Internalization that have damaged Plaintiff and the Class.  They also caused and/or permitted the filing and disseminating the August 2017 Proxies and August 2018 Proxy containing the misstatements and omissions of material fact set forth herein.  These actions could not have been a good faith exercise of prudent business judgment, or fiduciary oversight.

170.     As a direct and proximate result of the Director Defendants' misconduct and breaches of fiduciary duty, Plaintiff and the Class have suffered and will continue to suffer direct significant damages.  Their ownership in the Company has been materially diluted as a result of Defendants' breaches of fiduciary duty, and their stockholdings have been diminished in value as a result.

### JURY DEMAND

171.     Plaintiff demands a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Against all Defendants for damages sustained  as a result of Defendants' wrongful acts;

B.     Declaring that Defendants violated Sections 14(a) and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

C.     Awarding to Plaintiff the costs and disbursements of the action, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

Dated:  October 11, 2019

*/s/ Martin L. Welsh*

Martin L. Welsh (Nevada Bar No. 8720)
THE LAW OFFICE OF HAYES & WELSH
199 N. Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone: (702) 434-3444
Facsimile (702) 434-3739
Email: mwelsh@lvlaw.com

*Liaison Counsel*

LEVI & KORSINSKY LLP Donald
J. Enright, Esq.
(Admitted This Case Only)  1101
30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile:  (202) 333-2121
Email: denright@zlk.com

LAW OFFICE OF  CHRISTOPHER J.
GRAY P.C. Christopher J. Gray, Esq.
(Admitted This Case Only)
360 Lexington Ave, 14th Floor
New York, New York 10017
Telephone: (212) 838-3221
Facsimile:  (212) 937-3139
Email: chris@investorlawyers.net

*Co-Lead Counsel*

LAW OFFICES OF
JOSHUA B. KONS, LLC
Joshua B. Kons, Esq.
(Admitted This Case Only)
100 Pearl Street, 14th Floor
Hartford, CT 06103
Telephone: (860) 920-5181
Facsimile: (860) 920-5174
Email: joshuakons@konslaw.com

*Additional Counsel for Plaintiff*