Ogonna M. Brown, Esq.
Nevada Bar No. 7589
Brian D. Blakley, Esq.
Nevada Bar No. 13074
**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996
Tel: (702) 949-8200
Fax: (702) 949-8298

VENABLE LLP
G. Stewart Webb, Jr., Esquire
John T. Prisbe, Esquire
(counsel will comply with LR IA 11-2 within 45 days)
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742
*Attorneys for Defendants The Parking REIT, Inc., Robert Aalberts, David Chavez, John Dawson, Shawn Nelson, Nicholas Nilsen, William Wells, and Allen Wolff*

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

## DISTRICT COURT
## CLARK COUNTY, NEVADA

SIPDA REVOCABLE TRUST, by Trenton J. Warner, Trustee, on behalf of itself and all others similarly situated,

Plaintiffs,

v.

THE PARKING REIT, INC., MICHAEL V. SHUSTEK, ROBERT J. AALBERTS, DAVID CHAVEZ, JOHN E. DAWSON, SHAWN NELSON, NICHOLAS NILSEN, WILLIAM WELLS and ALLEN WOLFF,

Defendants.

CASE NO. 2:19-cv-00428-APG-BNW

**MOTION BY THE PARKING REIT, INC. AND THE INDEPENDENT DIRECTORS TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 2

      A.   The Parties. ............................................................................................... 2

      B.   This Lawsuit and the FAC's Allegations ............................................... 4

      C.   The Merger in 2017 ................................................................................. 6

      D.   The MVP-II Charter Amendments in 2017 ........................................... 7

      E.   The 2108 TPR Proxy .............................................................................. 9

i

F.    The Internalization in 2019 ............................................................... 9

III.    ARGUMENT ........................................................................................ 10

A.    Legal Standards ............................................................................. 10

B.    The FAC Should Be Dismissed Because It Fails to Plead a Cognizable Direct Stockholder Claim and Plaintiff Lacks Standing to Bring a Derivative Claim ........................................... 11

C.    The FAC Also Should Be Dismissed Because the Allegations Fail to Adequately or Plausibly Allege a Claim ........................... 14

1.    Count I Should Be Dismissed Because the FAC Fails to Adequately or Plausibly Allege A Material False Statement or Omission in a Proxy, As Well As Other Necessary Elements for a §14(a) Claim ................... 14

2.    Because the FAC Fails to Plead a Cognizable Claim under §14(a), Count II Also Should Be Dismissed ........................... 17

3.    Count III Should Be Dismissed for the Same Reasons and Also Because the Claim is Filed in the Wrong Court and the FAC Fails to Provide Well Pled Factual Allegations Overcoming the Business Judgment Rule ............................... 17

IV.    CONCLUSION ................................................................................... 20

110209458.1

# TABLE OF CASES

**Page(s)**

**Cases**

*7547 Corp. v. Parker & Parsley Development Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) ................................................................................7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2008) ........................................................................................11

*Bontempo v. Lare*,
  119 A.3d 791 (Md. 2015) ................................................................................12

*Bontempo v. Lare*, 90 A.3d 559 (Md. Ct. Spec. App. 2014),
  aff'd, 119 A.3d 701 (2015) ............................................................................12

*Calamore v. Juniper Networks, Inc.*,
  364 Fed. Appx. 370 (9th Cir. 2010) ...............................................................13

*City Partnership Co. v. Jones Intercable, Inc.*,
  213 F.R.D. 576 (D. Colo. 2002) .......................................................................7

*Copeland v. Lane*,
  2012 WL 4845636 (N.D. Cal. Oct. 10, 2012) ............................................1, 11

*Desaigoudar v. Meyercord*,
  223 F.3d 1020 (9th Cir. 2000) ....................................................................10,14

*Dreilingv. Am. Exp. Co.*
  458 F.3d 942 (9th Cir. 2006) ............................................................................4

*Freedman v. magicJack Vocaltec, Ltd.*,
  2018 WL 6110996 (S. D. Fla. Nov. 11, 2018)
  (appeal filed and pending) .............................................................................11

*In re Countrywide Financial Corp. Derivative Litigation*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..........................................................11

*In re CRM Holdings, Ltd. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..................................................15

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ....................................................................11,14

*Int'l Longshore and Warehouse Union v. Port of Portland*,
  844 F.3d 864 (9th Cir. 2016) ..........................................................................17

*3993 Howard Hughes Pkwy, Suite 600*
*Las Vegas, NV 89169-5996*

**Lewis Roca**
ROTHGERBER CHRISTIE

110209458.1

*In re Intel Securities Litigation*,
   2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)...........................................................................4

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964)...............................................................................................................11

*Khoja v. Orexigen Therapeutics*,
   899 fF.3d 988 (9th Cir. 2018)..................................................................................................4

*Klaus v. Hi-Shear Corp.*,
   528 F.2d 225 (9th Cir. 1975) ...................................................................................................7

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) .................................................................................................12

*Ley v. Viston*,
   540 F.3d 376 (6th Cir. 2008) .................................................................................................15

*Matthews v.Headley Chocolate Co.*,
   100 A. 645 (Md. 1917) ...........................................................................................................12

*New York City Employees' Ret. Sys. v. Jobs*,
   593 F.3d 1018 (9th Cir. 2010) ...............................................................................................14

*Oliveira v. Sugarman*,
   152 A.3d 728 (Md. 2017) ...................................................................................................2,12

*Oliveira v. Sugarman*,
   130 A.3d 1085 (Md. Ct. Spec. App. 2016), *aff'd*, 152 A.3d 728 (2017)...............................12

*Paracor Finance, Inc. v. General Electric Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) .................................................................................................17

*Paskowitz v. Wohlstadter*
   822 A.2d 1272 (Md. Ct. Spec. App. 2003) ............................................................................12

*Police and Fire Retirement System of the City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)....................................................................................11

*Shenker v. Laureate Education, Inc.*,
   938 A.2d 408 (Md. 2009) .........................................................................................................1

*Sutton v. FedFirst Financial Corp.*,
   126 A.3d 765 (Md. Ct. Spec. App. 2015), *cert. denied*, 132 A.3d 195 (2016).......................13

*Waller v. Waller*,
   49 A.2d 449 (Md. 1946) .........................................................................................................13

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

1    Defendants The Parking REIT, Inc. ("TPR" or the "Company"), Robert Aalberts, David

2    Chavez, John Dawson, Shawn Nelson, Nicholas Nilsen, William Wells, and Allen Wolff (the

3    "Independent Directors" and, collectively with TPR, the "Defendants") move to dismiss the first

4    amended complaint (the "FAC"), filed by Plaintiff SIPDA Revocable Trust, by and through its

5    trustee, Trenton J. Warner ("SIPDA" or "Plaintiff"), in its entirety, and with prejudice, pursuant to

6    Federal Rules of Civil Procedure 9(b), 12(b)(2), and 12(b)(6).

## I.    INTRODUCTION

8    The FAC attempts three claims: (i) Count I alleges a claim for purported violations of §14(a)

9    of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.A. §78n(a), and Securities

10   and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. §240.14a-9; (ii) Count II is a claim for

11   control person liability under §20(a) of the Exchange Act, 15 U.S.C.A. §78t(a); and (iii) Count III

12   is a state law breach of fiduciary duty claim.  The FAC fails to plead any viable claim against

13   Defendants for multiple reasons and should be dismissed.

14   First, the FAC fails to plead a cognizable direct stockholder claim and, because Plaintiff

15   never made a derivative demand upon TPR's Board of Directors and has not alleged that a demand

16   would be futile, Plaintiff lacks standing to bring a stockholder derivative claim.  The allegations in

17   the FAC are of purported claims that are derivative in nature under Maryland law, which is the state

18   of incorporation of TPR.  *See, e.g., Copeland v. Lane*, 2012 WL 4845636, at *9-12 (N.D. Cal. Oct.

19   10, 2012) (dismissing action, explaining that §14(a) claim was derivative in nature, and rejecting

20   plaintiff's argument there also was a direct claim alleged); *Shenker v. Laureate Education, Inc.*, 938

21   A.2d 408, 425 (Md. 2009) ("Whether a cause of action is individual or derivative must be

22   determined from the nature of the wrong alleged and the relief, if any, that could result if the plaintiff

23   were to prevail") (quoting 12B William Meade Fletcher, Cyclopedia of the Law of Private

24   Corporations § 5911 (2009 Rev. Vol.)).  Because the FAC does not plead a cognizable direct

25   stockholder claim or compliance with the requirements for bringing a derivative stockholder claim,

26   dismissal should be entered.

27   Even assuming *arguendo* that the FAC had asserted an actionable direct stockholder claim

28   against Defendants, the FAC fails to allege a viable claim for other reasons.  As to the federal

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

securities claims, the FAC fails to: (i) plead facts supporting such a claim with the specificity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which impose heightened pleading requirements for allegations sounding in fraud and for securities claims, such as those in the FAC; (ii) plausibly allege that a false statement in or a material factual omission from a proxy issued to Plaintiff rendered the proxy materially misleading; or (iii) allege well pled facts establishing loss causation and that a false statement or material factual omission in a proxy was an essential link to a transaction being challenged.

The breach of fiduciary duty claim is defective for similar reasons, and also because it is brought in the wrong forum[1] and the FAC's allegations fail to overcome the presumptions and protections of the business judgment rule under Maryland law. *Oliveira v. Sugarman*, 152 A.3d 728, 736 (Md. 2017) (under Maryland law, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. Absent an abuse of discretion, that judgment will be respected by courts.") (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *see also* Md. Code Ann., Corps. & Ass'ns (the "Maryland General Corporation Law" or "MGCL"), § 2-405.1(g) (codifying the Maryland business judgment rule). The FAC fails to meet that further pleading burden.

## II.   FACTUAL BACKGROUND

### A.   The Parties.

The FAC alleges that Plaintiff is a trust organized under the laws of South Dakota, the trust purchased 4,000 shares of common stock in MVP REIT II, Inc. (n/k/a TPR) around September 2016, and the trust "has held shares of the Company at all relevant times...." FAC ¶ 16.

---

[1]   As provided for under Maryland law and TPR's bylaws, and *inter alia* to avoid multiple lawsuits being filed in multiple jurisdictions over the same or similar issues, internal corporate claims involving TPR (such as Count III) must be brought in the Circuit Court for Baltimore City, Maryland or, if that state circuit court does not have jurisdiction, the United States District Court for the District of Maryland, unless TPR agrees otherwise in writing. *See* Discussion *infra* §III(C)(3), at p. 21-22.

2

Defendant TPR is a corporation organized under the laws of Maryland with its principal place of business in Nevada.  FAC ¶ 17.  TPR is a public, non-listed real estate investment trust ("REIT") focused on acquiring, owning, and managing parking facilities. [2]  FAC ¶¶ 39-40.  Prior to a December 2017 name change after a merger transaction described below (the "Merger" or "2017 Merger"), TPR was known as MVP REIT II, Inc. ("MVP-II").  From its formation in 2015 and until an internalization transaction in 2019 (the "Internalization"), TPR had no employees and its operations were externally managed.  The external manager was an entity named MVP Realty Advisors, LLC (the "Advisor"), and the Advisor had a contractual advisory agreement with TPR under which the Advisor provided services.

Defendants Robert Aalberts, David Chavez, John Dawson, Shawn Nelson, Nicholas Nilsen, Williams Wells, and Allen Wolff are professionals who have served as independent, outside directors of TPR or MVP-II at various times.  FAC ¶¶ 19-25.  Defendants Aalberts, Dawson, Nelson, and Nilsen presently serve as TPR directors, and Defendants Chavez, Wells, and Wolff are former TPR directors.

As to which persons served as directors at relevant times, the FAC's allegations seek damages for and focus upon two transactions for which Plaintiff asserts that TPR overpaid or made an unnecessary payment: (i) the Merger in 2017, with Plaintiff now characterizing a $3.6 million merger fee payment as an inappropriate "gratuity," FAC ¶ 7;[3] and (ii) the Internalization in 2019; with Plaintiff asserting that TPR gave substantial consideration "while gaining assets of negligible value."  FAC ¶ 94.  In 2017, at the time of the Merger, there were five directors of MVP-II (n/k/a TPR) who were Defendants Chavez, Dawson, and Wolff, as well as the other named defendant in this action, Michael Shustek, and non-party Erik Hart.  At the time of the Internalization in 2019,

---

[2]     A REIT is a company owning real estate which generates income and, as part of its structure, generally must pay 90% of annual income back to investors.  Many REITs specialize in a specific real estate sector and focus their time, energy, and funding on that particular segment.  A public, non-listed REIT is registered with the SEC and required to make regular SEC disclosures, but the common stock does not trade on a securities exchange such as the New York Stock Exchange, NASDAQ, etc.  *See generally* Guide to Public Non-Listed REITs, by the National Association of Real Estate Investment Trusts, available at https://www.reit.com/what-reit/types-reits/guide-public-non-listed-reits-pnlrs (last visited January 5, 2020).

[3]     As discussed *infra* at pp. 18-19, the $3.6 million payment was made pursuant to the terms of a Termination and Fee Agreement dated May 26, 2017.  In the original complaint filed by Plaintiff, this payment was mentioned, but it was not characterized as a "gratuity" or as improper.

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

3

1    there were seven TPR directors who were Defendants Aalberts, Chavez, Dawson, Nelson, Nilson,

2    Shustek, and Wells.[4]

3         Defendant Shustek serves as a TPR director and also as TPR's CEO.  FAC ¶ 18.  Mr. Shustek

4    was involved in the formation of MVP-II and in the earlier formation, in 2012, of another REIT

5    known as MVP REIT, Inc. ("MVP-I"), which REIT also focused upon ownership of parking

6    properties; and Mr. Shustek served on the boards of both corporations.  In addition, as disclosed and

7    as noted in the FAC, Mr. Shustek was the CEO of the entity that previously was the outside advisor

8    for both MVP-II and MVP-I, *i.e.*, the CEO of the Advisor, and Mr. Shustek indirectly holds an

9    interest in that entity.  In light of Mr. Shustek's involvement with the Advisor, Mr. Shustek recused

10   himself from the TPR Board's consideration and voting on the Internalization transaction.  *See* April

11   3, 2019 Form 8-K Filing by TPR disclosing the Internalization, copy submitted as Exhibit 1, at 8.[5]

12   Mr. Shustek also had recused himself when the Board of Director voted in 2017 regarding approval

13   of the possible merger between MVP-I and MVP-II, as he then sat on the Boards of both

14   corporations.  Exhibit 4 (Proxy/Prospectus to MVP-I stockholders) at 91-92.

15   **B.    This Lawsuit and the FAC's Allegations.**

16        Plaintiff filed the above-captioned action on March 12, 2019, ECF No. 1, before the

17   Internalization. Thus, the original complaint focused upon the Merger and a potential third amended

18   advisory agreement that never became effective.  On October 11, 2019, Plaintiff filed the FAC,

19   shifting the focus of its pleading to the Internalization.[6]

20   ───────────────

     [4]    After the Merger, the TPR Board increased from five members to eight members, with three persons who had
21   served as directors of the acquired REIT, which was MVP REIT, Inc, ("MVP-I"), serving on the expanded TPR Board
     until the next annual elections (those three former MVP-I directors who began serving as directors of the combined
22   entity are Messrs. Aalberts, Dawson, and Nilson).
     [5]    The FAC asserts allegations "upon information and belief," including based upon review "of the Company's
23   regulatory filings, publicly available news articles, weblog postings, and other publicly available information."  FAC at
     p. 2 & n. 1.  When considering a motion to dismiss, a court may consider documents incorporated into or substantively
24   referenced in a complaint or that form the basis for a claim.  *In re Intel Securities Litigation*, 2019 WL 1427660, *6
     (N.D. Cal. Mar. 29, 2019) (citing *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1002 (9th Cir. 2018)).  A court also
25   may take judicial notice of documents or facts, and "SEC filings are routinely subject to judicial notice."  *In re Intel
     Securities Litigation*, 2019 WL 1427660, *6 (citing *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 (9th Cir. 2006)).  This
26   Court may consider the exhibits being submitted by defendants when resolving the motion to dismiss.
     [6]    Subsequent to the Internalization, which was effective April 1, 2019, two stockholder putative class actions
27   were filed in the Circuit Court for Baltimore City, Maryland, also grounded upon allegations regarding the
     Internalization.  The two cases are *Arthur Magowski, as custodian of his IRA, on behalf of himself and all others
28   similarly situated v. The Parking REIT, Inc., et al.*, Case No. 24-C-19-003125 (filed May 31, 2019) and *Michelle Barene,
     as custodian of her IRA, on behalf of herself and all others similarly situated v. The Parking REIT, Inc., et al.*, Case No.
     24-C-19-003527 (filed June 28, 2019).  Docket information for those cases is available at the Maryland Judiciary's Case

4

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

1    Count I is a claim against all Defendants for alleged violations of §14(a) of the Exchange

2    Act and SEC Rule 14a-9.  The core of that claim is Plaintiff's contention that, in 2017 and 2018,

3    Defendants failed to disclose the "true purpose" for the Merger and certain charter amendments in

4    2017, which was a purported "secret plan" to have TPR overpay for the internalization of advisory

5    functions if that occurred in the future.  *See* FAC at ¶¶ 8, 108, 114, 122, 124, 128, 167 (Plaintiff's

6    characterizations regarding the "real purposes" of actions in 2017 supposedly being "to pave the

7    way for an amended advisory agreement designed to benefit Defendant Shustek financially in the

8    event of an internalization or a change of control transaction" and to give Defendant Shustek "the

9    unfettered ability to cause [TPR] to internalize its advisory function or otherwise terminate the

10   Advisor's contract with [TPR] and thereby trigger an enormous termination fee of up to $21 million

11   for Advisor").

12   Based upon conclusory allegations that TPR overpaid for assets acquired in the 2019

13   Internalization and that such harm to TPR in turn diluted the value of the common stock of existing

14   stockholders, *see, e.g.,*  FAC ¶ 94 ("the Internalization Agreements caused Parking REIT [to] pay

15   substantial value and to assume substantial liabilities, while gaining assets with negligible value"),

16   Count I seeks to recover damages for such alleged overpayment by TPR.  FAC ¶ 2 ("This action

17   seeks damages...").

18   Because a claim under §14(a) is for harm caused by a materially misleading proxy and

19   because the 2019 Internalization did not involve a stockholder vote or a proxy solicitation, as

20   grounds for Count I, the FAC attempts to reach back in time to proxy materials issued to TPR

21   stockholders on August 15, 2017 (the "2017 TPR Proxy") and August 20, 2018 (the "2018 TPR

22   Proxy"), both of which were associated with annual meetings and involved MVP-II/TPR

23   stockholder votes on other matters.  A copy of the 2017 TPR Proxy is submitted as Exhibit 2 and a

24   copy of the 2018 TPR Proxy is submitted as Exhibit 3.  Neither of those proxies solicited votes on

25   the Merger transaction or on the Internalization transaction.

26   Search website (http://casesearch.courts.state.md.us/casesearch/).  Likely recognizing that claims based upon the TPR
     Board's business decision to proceed with an internalization transaction are derivative in nature and not direct, Mr.
27   Magowski also delivered a stockholder derivative demand letter dated June 19, 2019 to TPR's Board of Directors.  In
     response to that demand letter, TPR's Board of Directors formed a committee to investigate and respond on the subject
28   matter of the demand.  That process is in progress, with the committee aided by counsel that it has retained to assist (the
     Ballard Spahr LLP law firm).

5

Count II is a claim against the director defendants for alleged control person liability under Section 20(a) of the Exchange Act, and thus Count II is dependent upon whether a viable claim is alleged under Count I.

Count III is a state law claim asserted against the director defendants for alleged breach of fiduciary duty and is similarly grounded upon Plaintiff's allegations that the "true reasons" for the Merger involved a "secret plan" and ultimately resulted in the supposed overpayment by TPR, in 2019, in connection with the assets acquired in the Internalization.  FAC ¶¶ 167 & 169.

**C.      The Merger in 2017.**

The FAC includes allegations tracing back to early 2017 and a merger between MVP-II and MVP-I.  As disclosed in the Joint Proxy/Prospectus to MVP-I Stockholders for the proposed merger, in 2016, the Boards of both MVP-I and MVP-II formed special committees consisting of directors who were independent from management to explore a possible strategic transaction, including a possible merger transaction between the two REITs.  *See* August 16, 2017 Joint Proxy/Prospectus filed with the SEC and sent to the MVP-I stockholders in connection with the proposed merger (the "2017 MVP-I Stockholder Proxy"), copy submitted as Exhibit 4.  The two special committees each hired their own legal counsel and financial advisors to assist them, and the exploration and negotiation process continued for months.  *Id.* at 85-92. (describing activities occurring from June 2016 through May 2017).

On May 1, 2017, the companies jointly announced the acceptance of a non-binding letter of intent regarding a proposed merger of MVP-I with MVP-II, subject to certain conditions, including entry into a definitive merger agreement, third party approvals, and, if a definitive merger agreement was reached, any required stockholder approvals.  *See* May 1, 2017 Form 8-K SEC Filing by MVP-II, copy submitted as Exhibit 5 (announcing same).  Continued negotiations led to the execution of an Agreement and Plan of Merger dated as of May 26, 2017, and related documents that included a possible Second Amended and Restated Advisory Agreement dated May 26, 2017 and a Termination and Fee Agreement dated May 26, 2017.  *See* May 31, 2017 Form 8-K Filing by MVP-II, copy submitted as Exhibit 6 (announcement and description of agreement for plan of merger, with copies the referenced agreements included as exhibits).

6

The proposed merger contemplated MVP-I and MVP-II combining, MVP-II being the surviving entity, MVP-I stockholders receiving MVP-II common stock in exchange for their existing MVP-I stock, and the combined company being renamed "The Parking REIT, Inc." 2017 MVP-I Stockholder Proxy at 8. The Merger was conditioned upon the MVP-I stockholders voting to approve both the Merger and an amendment of the MVP-I charter that was believed to be necessary to allow MVP-I to proceed with the Merger. On September 27, 2017, the MVP-I stockholders voted and approved the Merger and related charter amendment. The Merger was completed in December 2017. *See* December 18, 2017 Form 8-K Filing by TPR, copy submitted as Exhibit 8 (completion of merger).

Of note regarding the Merger and the related 2017 MVP-I Stockholder Proxy, because MVP-II was the acquiring and surviving entity, approval by the MVP-II stockholders was not required. Thus, Plaintiff had no voting right on the proposed merger and no proxy was sent to Plaintiff requesting a vote on the Merger. The FAC also does not allege that Plaintiff was a stockholder of MVP-I or that he ever owned MVP-I stock. Thus, as an initial matter, Plaintiff lacks standing to bring a §14(a) claim that is based on the 2017 MVP-I Stockholder Proxy. *See 7547 Corp. v. Parker & Parsley Development Partners, L.P.*, 38 F.3d 211, 229-30 (5th Cir. 1994) (only stockholders with voting rights have standing to pursue §14(a) claim based upon an allegedly misleading proxy); *Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 232 (9th Cir. 1975) ("Section 14(a) is intended to insure that a shareholder <u>entitled to vote</u> on corporate decisions knows how his vote will be cast") (underline emphasis added); *City Partnership Co. v. Jones Intercable, Inc.,* 213 F.R.D. 576, 587 (D. Colo. 2002) ("Properly read, *7547 Corp.* stands for the unremarkable proposition that any party who was eligible to vote has standing to maintain a §14(a) action, while the rest of the world, which had no right to vote, has no such standing").

**D.    The MVP-II Charter Amendments in 2017.**

In September 2017, the MVP-II stockholders did consider and vote on proposed amendments to the MVP-II charter. *See* 2017 TPR Proxy (Exhibit 2). In this regard, the 2017 TPR Proxy was for the 2017 annual meeting of MVP-II. In addition to addressing approval of an accounting firm and the annual election of directors, the 2017 TPR Proxy explained that one of the

7

reasons the boards of directors of the two corporations approved of pursuing a  proposed merger was that the increased size and scale provided by such a merger, if completed, was expected to enhance the combined company's ability to list its shares of common stock on a national securities exchange.  *Id*. at p. i.   The 2017 TPR Proxy presented seven proposals regarding possible amendments for the MVP-II charter, attached a copy of the proposed Amended Charter as an appendix, and explained the beliefs regarding the presented amendments:

> The Amended Charter is primarily intended to accomplish two objectives in connection with the possible listing of our common stock after the closing of the merger: (1) to remove provisions of our charter that we believe may unnecessarily restrict our ability to take advantage of further opportunities for liquidity events or are redundant with or otherwise addressed or permitted to be addressed under Maryland law and (2) to amend certain provisions in a manner that we believe would be more suitable for becoming a publicly-traded REIT.  The amendments that we are proposing to accomplish these objectives are described in more detail in the attached proxy statement.

> We believe the Amended Charter will also more closely align our charter to those of our peers with publicly listed securities.  Currently, our charter includes provisions and restrictions that are required by state securities administrators in order for us to publicly offer shares of our stock without having it listed on a national securities exchange. Once our common stock is listed on a national securities exchange, these provisions and restrictions will no longer be required and, in some cases, if retained, would place restrictions on our activities that could put us at a competitive disadvantage compared to our peers with publicly listed securities.

*Id*. at pp. i-ii.

The proposed amendments to the MVP-II charter were not contingent upon the outcome of the vote by the MVP-I stockholders on the possible merger.  The MVP-II stockholders voted to approve each of the proposals, with more than 95% of votes cast in favor on each proposal.  *See* September 27, 2019 Form 8-K Filing, copy submitted as Exhibit 7 (reporting vote results).

The FAC alleges that the 2017 TPR Proxy was false and misleading because it failed to disclose that there was a "secret plan" and because, in background discussion when referencing the $3.6 million fee to be paid under the Termination and Fee Agreement, the proxy did not characterize the fee as amounting to a gratuity.  FAC ¶¶ 103, 112, 114.

. . .

. . .

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

8

**E.** **The 2018 TPR Proxy.**

The FAC also asserts that the 2018 TPR Proxy for the 2018 annual meeting of TPR stockholders was false and misleading. The 2018 TPR Proxy solicited proxies for votes on ratification of an accounting firm and annual election of directors. *See* Exhibit 3. The FAC alleges the 2018 TPR Proxy was false and misleading for the same reasons: it failed to disclose that there was a "secret plan" and, in background discussion when referencing the $3.6 million fee paid under the Termination and Fee Agreement, the proxy did not characterize the fee as amounting to a gratuity. FAC ¶¶ 122, 124, 128, 130.

**F.** **The Internalization in 2019.**

The FAC asserts that TPR overpaid for the assets acquired in the Internalization that occurred in 2019. A detailed explanation regarding the Internalization is set forth in TPR's public filing with the SEC. *See* Exhibit 1 (describing the Internalization).

In 2019, when evaluating whether TPR should then internalize the functions of its outside advisor, the six Independent Directors of TPR consulted with the legal, financial, and compensation advisors of the Company. Exhibit 1 at 3.[7] In reaching their determination that an internalization should proceed, the Independent Directors considered factors supporting the Internalization and also took into account negative factors with respect to the Internalization. Exhibit 1 at 3-7. Among the factors considered as supporting an internalization were:

- the belief that the Internalization may facilitate TPR's ability to raise capital to support its future growth;

- the belief that Internalization may facilitate a potential listing of TPR's stock on a national securities exchange;

- the belief that, as a result of the Internalization, the Board of Directors will be able to exercise direct oversight over management functions through a simplified corporate structure;

- the belief that the Internalization through an all stock deal will better align the interests of management with the interests of TPR and its stockholders;

---

[7] The Internalization was negotiated and unanimously approved by the six Independent Directors serving in March 2019. *Id.* Defendant Shustek did not participate in the Board meetings during which the Internalization was considered, *id.*, and he recused himself from consideration of the Internalization and abstained from voting it. *Id.*

9

110209458.1

-   the fact that the Consideration is to be paid entirely in shares of Common Stock in four installments, which preserves cash for investment in real properties;

-   the belief that Internalization will mitigate perceived or actual conflicts of interest between TPR and the Manager; and

-   an opinion issued by Ladenburg Thalmann & Co. Inc, dated March 29, 2019, to the Board of Directors as to the fairness to  TPR, from a financial point of view.

*Id.* at 3-7 (listing these and other factors, as well as potential negatives).  A review of these factors, both positive and negative factors, as considered by the Independent Directors of the Board, demonstrates the exercise of business judgment by the Independent Directors.

As explained in the April 3, 2019 Form 8-K filing regarding the Internalization, TPR accomplished the Internalization by (i) acquiring and assuming substantially all of the Advisor's assets along with related liabilities; (ii) terminating the advisory agreement arrangements with the Advisor; and (iii) obtaining as employees of the Company the executives and other employees of the Advisor.  Exhibit 1 at 3.  As consideration, TPR agreed to issue to the Advisor, over a period of more than two and a half years, a total of 1,600,000 shares of common stock of the Company in four equal installments of 400,000 shares each.  *Id.* at 8.  At the time of the filing of FAC, the first installment payment had been made.  The second installment of stock occurred on December 31, 2019, and the other two installments are scheduled for December 31, 2020 and December 31, 2021. *Id.*

### III.   Argument

#### A.  Legal Standards.

The allegations in the FAC sound in fraud and involve federal securities claims.[8]  When affirming dismissal of a deficiently pled §14(a) claim in *Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000), the Ninth Circuit explained that in these circumstances:

... Federal Rule of Civil Procedure 9(b) and the PSLRA require [a plaintiff] to plead her case with a high degree of meticulousness.  *See Yourish v. California Amplifier,*

---

[8]    The FAC sounds in fraud and, by way of example, alleges that Defendants proceeded with "a series of transactions designed and intended at all relevant times to transfer wealth and value from the stockholders," (FAC ¶ 3), that Defendants "did not disclose this secret plan," (FAC ¶ 8), that Defendants supposedly offered "disingenuous and underhanded rationale" for business decisions, (FAC ¶ 77), that Defendants supposedly failed "to disclose  ... the actual and primary reasons" that they had for the 2017 Merger and related charter amendments, (FAC ¶ 103), and that Defendants failed to disclose "the true purpose of the MVP Merger" (FAC ¶ 114) and the "secret plan" (FAC ¶ 122).

10

110209458.1

191 F.3d 983, 993 (9th Cir.1999) (noting applicability of Rule 9(b) to securities fraud claims); *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 996 (9th Cir.1999) (describing heightened pleading standard of the PSLRA). Rule 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The PSLRA modifies Rule 9(b), providing that a securities fraud plaintiff shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed. *See In re Silicon Graphics,* 183 F.3d at 996; 15 U.S.C. § 78u–4(b)(1).

223 F.3d at 1023. *See also Police and Fire Retirement System of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009) ("[w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements ... even if they disclaim reliance on a fraud theory") (citation omitted); *In re Countrywide Financial Corp. Derivative Litigation*, 554 F. Supp. 2d 1044, 1076 (C.D. Cal. 2008) ("The 'requisite level of culpability' under § 14(a) and Rule 14a-9 depends upon whether or not the allegations 'sound[] in fraud'") (citing *Desaigoudar*, 223 F.3d 1022-23).

Additionally, to survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). When considering a Rule 12(b)(6) motion, a court accepts as true only the well-pled factual allegations, but a court does not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

**B.  The FAC Should Be Dismissed Because It Fails to Plead a Cognizable Direct Stockholder Claim and Plaintiff Lacks Standing to Bring a Derivative Claim.**

Claims under §14(a) and state law breach of fiduciary duty claims can be either derivative or direct. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431-32 (1964) (indicating that under §14(a) "a right of action exists as to both derivative and direct causes" while further explaining that injury "from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done to the corporation, rather than from the damage inflicted directly upon the stockholder"); *Copeland v. Lane, supra* (concluding §14(a) claim was derivative); *Freedman v. magicJack Vocaltec, Ltd.*, 2018 WL 6110996 (S. D. Fla. Nov. 11, 2018) (holding §14(a) claim was derivative and dismissing

11

110209458.1

for failure to make derivative demand upon board of directors) (appeal filed December 21, 2018 and pending); D. H. DeMott, *Shareholder Derivative Action: Law and Practice*, § 4:6 at 486 (2019-2020 Ed.) (recognizing §14(a) claims often may be derivative claims).

Whether a claim is derivative or direct is determined by the law of the state of incorporation, in this case, Maryland. *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000). Under Maryland law, to determine whether a claim is derivative or direct, a court considers "(1) who suffered the alleged harm and (2) who would receive the benefit of any recovery or other remedy." *Oliveira v. Sugarman*, 152 A.3d 728, 742 n.15 (2017). *Cf. also Oliveira v. Sugarman*, 130 A.3d 1085, 1100 (Md. Ct. Spec. App. 2016) ("Whether a claim is derivative or direct is not a function of the label the plaintiff gives it. Rather, the nature of the action is determined from the body of the complaint.")(quoting *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1277 (Md. Ct. Spec. App 2003)), *aff'd*, 451 A.2d 208 (Md. 2017)).

Under Maryland law, direct claims by stockholders only exist if stockholders "have suffered some peculiar injury independent of what the company suffered." *Matthews v. Headley Chocolate Co.,* 100 A. 645, 650 (Md. 1917). *See also Oliveria,* 152 A.3d at 742 ("To assert a direct claim, a plaintiff must have suffered a 'distinct injury' separate from any harm suffered by the corporation. . . . The remedy that a shareholder seeks must benefit the shareholder as an individual, not the corporate entity") (citing *Shenker*); *Bontempo v. Lare*, 119 A.3d 791, 798 n.6 (Md. 2015) (Maryland's high court stating that the intermediate appellate court provided "an excellent summary" of the law when it stated in *Bontempo v. Lare*, 90 A.3d 559, 578 (Md. Ct. Spec. App. 2014), that "[t]o maintain a direct action, the shareholder must allege that he has suffered '*an injury that is separate and distinct* from any injury suffered either directly by the corporation or derivatively by the shareholder because of the injury to the corporation'") (citations omitted and italics emphasis added)).

Here, the harm or injury alleged in the FAC and for which a remedy is being sought is to the corporation. The allegations are that TPR overpaid for the assets acquired in the Internalization in 2019 and that TPR unnecessarily paid a $3.6 million "gratuity" in 2017. *Cf.* FAC ¶ 94 ("the Internalization Agreements caused Parking REIT [to] pay substantial value and to assume

12

110209458.1

substantial liabilities, while gaining assets with negligible value"); FAC ¶ 7 ("the $3.6 million merger fee amount to a gratuity" and MVP-II was "not under any legal obligation to agree to pay"). To prevail and recover for the harm alleged in the FAC, a plaintiff necessarily must prove that there was an injury to TPR by its $3.6 million payment and by its alleged overpayment for the assets acquired in the Internalization. Plaintiff here cannot prevail without first establishing there has been an injury to the corporation. Without proof that that there was an excessive payment by TPR in the Internalization or that TPR paid a $3.6 million sum that it should not have, there is no claim. Under Maryland law, the claim is derivative in nature. The direct injury is to the corporation; the harm, if any, to the stockholders is derivative in proportion to their stock ownership. *See Sutton v. FedFirst Financial Corp.*, 126 A.3d 765 (Md. Ct. Spec. App. 2015), *cert. denied*, 132 A.3d 195 (2016):

> It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

226 A.3d at 783 (quoting *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946)).

The relief sought also shows the derivative nature of the claim. That relief should flow to TPR because it is TPR that paid the $3.6 million fee, and it is TPR that paid or is paying the consideration in the Internalization. *Cf. Calamore v. Juniper Networks, Inc.*, 364 Fed. Appx. 370, 372 (9th Cir. 2010) (disclosure claims may be dismissed where a shareholder seeks a recovery owed to the corporation) (citing *In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 766, 772-74 (Del. 2006) which similarly dismissed for the failure to state a claim where plaintiffs were "conflating" a direct claim with relief "flowing from the corporation's separate and distinct underlying derivative claim")). Assessment of both the nature of the harm alleged and the relief sought confirms that the potential stockholder claims here are derivative in nature under Maryland law. No cognizable direct stockholder claim is alleged in the FAC.

13

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

As to a possible derivative claim, it is undisputed that Plaintiff never made a derivative demand upon the TPR Board and the FAC fails to allege that a demand was made or that a demand would have been futile.  Plaintiff therefore lacks standing to bring a derivative claim.  *See, e.g.,* Fed. R. Civ. P. 23.1 (requirements for a derivative complaint include alleging, with particularity, the efforts by plaintiff to obtain the desired action from the directors or the reasons for not doing so); *Sutton*, 126 A.3d at 783 n.16 ("Before instituting a derivative action, the plaintiff must make a demand on the corporation's board of directors to preserve the claim or demonstrate that such a demand would be futile") (citation omitted).  Dismissal of the FAC should be entered.

**C.    The FAC Also Should Be Dismissed Because the Allegations Fail to Adequately or Plausibly Allege a Claim.**

**1.    Count I Should Be Dismissed Because the FAC Fails to Adequately or Plausibly Allege A Material False Statement or Omission in a Proxy, As Well As Other Necessary Elements for a §14(a) Claim.**

"To state a claim under §14(a) and Rule 14a–9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'"  *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quotation marks omitted).  *See also Desaigoudar v. Meyercord*, 223 F.3d at 1022 (a plaintiff also must "demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction").  "In addition, private plaintiffs must meet the heightened pleading standards of the PSLRA, as well as its loss causation requirement." *Id.*

The FAC's primary contention on why the 2017 TPR Proxy and 2018 TPR Proxy  were misleading is the conclusory and unsupported allegation that the two proxies failed to disclose a purported "secret plan."  Those allegations are not supported by well pled factual allegations and the FAC fails to plausibly allege any such "secret plan." *In re Gilead Scis. Sec. Litig.,* 536 F.3d at 1055 ( a court does not accept as true "allegations that are merely conclusory" or "unwarranted deductions of fact").  Nowhere does the FAC plead  -- with particularity or plausibility -- the factual

14

specifics of a purported secret plan, persons agreeing to such a plan, or the other circumstances associated with the conclusory contention of Plaintiff.  In contrast, the various proxy materials, and other disclosures, disclose the objective factual matters that factored into the transactions or business decisions that were made by the Board when approving the Internalization in 2019 and the Merger in 2017.  When providing a proxy, defendants are not required to adopt the mischaracterizations or negative characterizations suggested by a plaintiff.  *See Ley v. Viston*, 540 F.3d 376, 383 (6th Cir. 2008) ("a company is not required to use the negative characterizations that Plaintiffs suggest"); *In re CRM Holdings, Ltd. Litig*., 2012 WL 1646888, at *27 (S.D.N.Y. May 10, 2012) ("So long as a corporation makes disclosure of material objective factual matters, it need not characterize or editorialize on those facts in any particular way") (citation omitted).

The FAC also contends that proxy materials to Plaintiff were rendered materially misleading because, according to Plaintiff, when the 2017 TPR Proxy and 2018 TPR briefly mentioned the $3.6 million payment made by TPR to the Advisor in connection with the Merger, the proxies did not characterize the sum as being a gratuity for which there was no legal obligation to pay.  That conclusory contention is wholly lacking in any factual support and ignores the contractual obligations of MVP-I and MVP-II, under the separate advisory agreements that the Advisor had with them.  Under both agreements, the Advisor was contractually entitled to certain compensation should the Merger occur.  The Advisor was contractually entitled to certain compensation where MVP-I ceased operations and terminated its advisory agreement with the Advisor.  *See* MVP-I Advisory Agreement, copy submitted as Exhibit 9, at §§ 8.5 & 13.3 (if agreement terminated, Advisor contractually entitled to receive payment for conversion shares, in addition to fees and expenses).  At the same time, under 9(a) of the then-existing advisory agreement between the Advisor and MVP-II, the Advisor was entitled to an acquisition fee of 2.25% of any property assets acquired by MVP-II.  See MVP-II Advisory Agreement, copy submitted as Exhibit 10, at §9(a).  Far from being a "gratuity," the $3.6 million payment avoided multiple fees under both agreements and satisfied the contractual obligations of both MVP-I and MVP-II.

The Termination and Fee Agreement negotiated in connection with the Merger  resulted in limiting the payment made to the Advisor to <u>only</u> the §9(a) acquisition fee amount, and the Advisor

110209458.1

foregoing and waiving any other compensation to which it was entitled. As disclosed in proxy materials and as set forth in the Termination and Fee Agreement:

> Section 1.1  Termination of REIT I Advisory Agreement. Advisor and Company hereby agree that the REIT I Advisory Agreement shall be terminated, without any further liability or obligation on the part of any party thereto, effective as of the Merger Effective Time, subject to the last sentence of Section 1.4 and upon receipt by the Advisor of the Advisor Acquisition Payment payable pursuant to Section 1.3; provided, that, Articles 13, 15, 16 and 17 of the REIT I Advisory Agreement shall survive termination.

> Section 1.2  Waiver of Termination Fees. Advisor hereby irrevocably and unconditionally relinquishes and waives any and all fees or compensation payable to Advisor in connection with the termination of the REIT I Advisory Agreement or the Merger. For the avoidance of doubt, none of the fees contemplated by Section 13.3 of the REIT I Advisory Agreement nor any other payment not contemplated by this Agreement (including, but not limited to, any Disposition Fees, as such term is defined in the REIT I Advisory Agreement) shall be payable in connection with the termination of the REIT I Advisory Agreement or the Merger.

> Section 1.3  Advisor Acquisition Payment. **The fee payable to the Advisor pursuant to** and in full satisfaction of **Section 9(a) of the REIT II Advisory Agreement (the "Advisor Acquisition Payment"), which shall be the only fee payable to the Advisor in connection with the Merger** (as defined in the Merger Agreement), [and] shall be paid by REIT II to the Advisor on the Closing Date to the account of Advisor as set forth in Schedule I to this Agreement.

> (bold emphasis added).

The FAC's conclusory contentions regarding a supposed $3.6 million "gratuity" payment in connection with the Merger fail to plausibly allege any misleading proxy and ignore provisions of the very contracts -- the Termination and Fee Agreement and the advisory agreements -- on which the claim is based. These agreements did impose contractual obligation on MVP-I upon termination of the MVP-I Advisory Agreement and on MVP-II upon acquisition of the assets of MVP-I through the Merger. The Termination and Fee Agreement then contractually reduced and limited those sums. Plaintiff cannot circumvent these contractual obligations by conclusory, unsupported allegations.

Separately, the allegations in the FAC fail to establish loss causation. Neither the above-discussed allegations nor any other passing allegation in the FAC establishes loss causation for the harm alleged or the damages sought in the FAC. In 2019, the Independent Directors then serving

16

110209458.1

on TPR's Board, aided by legal, financial, and compensation professionals, exercised their business judgments to unanimously approve proceeding with an internalization under the circumstances existing at the time.  No years-earlier proxy on different matters has any causal connection to that exercise by the Independent Directors of their business judgments in 2019.  The FAC fails to adequately or plausibly allege loss causation or that the years-earlier proxy materials was an essential link to business judgment decisions by independent directors in 2019.  *See N.Y. City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1024 (9th Cir. 2010 ("conclusory assertions of loss are insufficient."); 15 U.S.C. 78u-4(b)(4) ("In any private action arising under [the Exchange Act], the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages.").

> **2.   Because the FAC Fails to Plead a Cognizable Claim under §14(a), Count II Should Be Dismissed.**

To establish a claim for "controlling person" liability under § 20(a) of the Exchange Act, a plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator.  *Paracor Finance, Inc. v. General Electric Capital Corp*., 96 F.3d 1151, 1161 (9th Cir. 1996).  Because Count I fails to adequately or plausibly plead a primary claim under §14(a), Count II also should be dismissed.

> **3.   Count III Should Be Dismissed For the Same Reasons, and Also Because the Claim Is Filed in the Wrong Court and the FAC Fails to Provide Well Pled Factual Allegations Overcoming the Business Judgement Rule.**

Count III alleges a state law claim for breach of fiduciary duty against all director defendant based upon the same allegations previously discussed.  FAC ¶ 166).  First, if this Court dismisses the federal claims which serve as the basis for original jurisdiction, and with pending state court lawsuits in Maryland addressing similar breach of fiduciary duty allegations regarding the Internalization, the Court may exercise its discretion and dismiss the state law claim without addressing it.  *See Int'l Longshore and Warehouse Union v. Port of Portland*, 844 F.3d 864, 866 n. 1 (9th Cir. 2016) ("This court has advised that when all federal law claims are eliminated before trial, the district court is 'duty-bound to take seriously' the responsibility to decline or retain jurisdiction over any remaining state law claims") (citing *Acri v. Varian Assocs., Inc.,* 114 F.3d 999,

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

1001 (9th Cir. 1997) (en banc)).   Second, if the Court addresses the claim, dismissal should be entered because Plaintiff has filed the claim in the wrong jurisdiction.   Under §2-113(b) of the MGCL, a Maryland corporation may require that any internal corporate claims be brought in courts sitting in a specified jurisdiction:

§ 2-113.  Internal Corporate claims.

(b) *Jurisdiction*. –

(1) Except as provided in paragraph (2) of this subsection, the charter or bylaws of a corporation may require, consistent with applicable jurisdictional requirements, that any internal corporate claim be brought only in courts sitting in one or more specified jurisdictions.

(2)   (i)   This paragraph does not apply to a provision contained in the charter or bylaws of a corporation on October 1, 2017, unless and until the provision is altered or repealed by an amendment to the charter or bylaws of the corporation, as applicable.

(ii)   The charter or bylaws of a corporation may not prohibit bringing an internal corporate claim in the courts of this State or a federal court sitting in this State.

The MGCL defines an internal corporate claim as "a claim, including a claim brought by or in the right of a corporation: (1) Based on an alleged breach by a director, an officer, or a stockholder of a duty owed to the corporation or the stockholders of the corporation or a standard of conduct applicable to directors; (2) Arising under this article; or (3) Arising under the charter or bylaws of the corporation."  MGCL §1-101(q).  The breach of fiduciary duty claim asserted under Count III is such a claim.

Pursuant to the MGCL, TPR has adopted a forum selection bylaw governing internal corporate claims.  Article XIII of TPR's Bylaws provides as follows:

**EXCLUSIVE FORUM FOR CERTAIN LITIGATION**

Unless the Corporation consents in writing to the selection of an alternative forum, the Circuit Court for Baltimore City, Maryland, or, if that Court does not have jurisdiction, the U.S. District Court for the District of Maryland, Baltimore Division, shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation; (b) any action asserting a claim of breach of any duty owed by any director or officer or other employee of the Corporation to the Corporation or to the stockholders of the Corporation; (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the MGCL or

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

18

the Charter or Bylaws; or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation that is governed by the internal affairs doctrine.

Exhibit 11 at Article XIII.  Thus, the required jurisdiction and forum for the breach of fiduciary claim under Count III is a court located in Maryland, and the claim should be dismissed for that reason.

If the Court nonetheless reaches the merits of Count III, for the same reasons that the conclusory allegations in the FAC fail to state any cognizable securities claim, they fail to allege any viable breach of fiduciary duty claim under Maryland law.  In addition, Count III should be dismissed because the FAC fails to present well-pled factual allegations that overcome the presumptions and protections of the business judgment rule under Maryland law.

In Maryland, "[u]nder the traditional business judgment rule, courts apply a presumption of disinterestedness, independence, and reasonable decision-making to all business decisions made by a corporate board of directors."  *Oliveira*, 152 A.3d at 736 ; *see also Shenker*, 983 A.2d at 424.  "The business judgment rule protects corporate directors from liability when the majority of directors act prudently and in good faith."  *Oliveira*, 152 A.3d at 736.

The business judgment rule is particularly strong in Maryland because it has become statutorily grounded and reflects the judgment of the Maryland General Assembly that the decisions of a corporate board are, absent particularized factual allegations to be contrary, to be respected by the courts.  *Oliveira*, 152 A.3d at 736-37.  The rule is codified at MGCL § 2-405.1(g): "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section," which requires that a director act "in good faith; . . . [i]n a manner the director reasonably believes to be in the best interests of the corporation; and . . . [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances," *id.* § 2-405.1(c).  "The burden is on the plaintiff to rebut these presumptions."  *Oliveira*, 152 A.3d at 736 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

The allegations in the FAC fail to rebut the presumptions of the business judgment rule and do not really attempt to do so.  At the time of the Internalization, the Independent Directors on the TPR Board and named as defendants in this lawsuit were Robert Aalberts, David Chavez, John

19

110209458.1

Dawson, Shawn Nelson, Nicholas Nilsen, and William Wells.[9]  The FAC only briefly mentions the names of these directors at ¶¶ 19-25; their names are not mentioned thereafter in the FAC.  The FAC offers no well pled allegations and makes no actual attempt to overcome the business judgment rule presumptions of disinterestedness, independence, and good faith afforded to directors under Maryland law.

## IV.    CONCLUSION

For the reasons set forth above, Defendants submit that the FAC fails to allege a viable claim against any of the Defendants and this Court should dismiss the FAC in its entirety with prejudice.

Dated:  January 9, 2020

/s/ Ogonna M. Brown
Ogonna M. Brown, Esq.
Nevada Bar No. 7589
Brian D. Blakley, Esq.
Nevada Bar No. 13074
LEWIS ROCA ROTHBERGER CHRISTIE LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

VENABLE LLP
G. Stewart Webb, Jr., Esquire
John T. Prisbe, Esquire
(counsel will comply with LR IA 11-2 within 45 days)
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202

*Attorneys for Defendants The Parking REIT, Inc., Robert J. Alberts, David Chavez, John E. Dawson, Shawn Nelson, Nicholas Nilsen, William Wells, and Allen Wolff*

---

[9]    Defendant Shustek was the seventh director, but as noted previously, he recused himself from the negotiations and voting on the Internalization transaction.

110209458.1

1

### **CERTIFICATE OF SERVICE**

2   I hereby certify that on January 9, 2020, I electronically submitted the foregoing document

3 with the Clerk of the Court for the U.S. District Court, District of Nevada, using the CM/ECF System

4 of the Court and that I have served all counsel of record electronically or by another manner

5 authorized by Federal Rule of Civil Procedure 5(b)(2).

6   ☒ Electronic Service – By serving a copy thereof through the Court's electronic

7 service system; and/or

8   ☐ U.S. Mail—By depositing a true copy thereof in the U.S. mail, first class postage

9 prepaid and addressed as listed below.

10

       /s/ *Kennya Jackson*

11        An employee of
        LEWIS ROCA ROTHGERBER CHRISTIE LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21